OPINION OF THE COURT
Stein, J.
On February 9, 2006, defendant escaped from the secure psychiatric unit of Berkshire Medical Center. He had been brought to the facility almost a week earlier by his grandmother due to his aberrant behavior. It was the fourth time in three years that family members had brought him to the psychiatric facility and, at the time of his escape, thé facility was in the process of attempting to have him involuntarily committed. Less than two days later, on February 11, 2006, defendant murdered the victim, a man he had met briefly only once before on January 25, 2006.
Defendant was indicted on, among other things, murder in the second degree and a plea bargain was reached between defendant and the People wherein defendant agreed to plead not responsible by reason of mental disease or defect (see CPL 220.15; Penal Law § 40.15). However, the plea was rejected by County Court (Czajka, J.) and the case proceeded to trial. At the conclusion of the trial, the jury found defendant guilty of murder in the second degree, rejecting his affirmative defense of not responsible by reason of mental disease or defect. Due to various errors, we reversed on appeal and ordered a new trial before a different judge (63 AD3d 34 [2009], lv denied 12 NY3d 924 [2009]).
Prior to the second trial, County Court (Nichols, J.) found defendant to be an incapacitated person (see CPL 730.10 [1]) and *192 committed him to the Mid-Hudson Forensic Psychiatric Center (hereinafter MHFPC) in November 2009. By January 2010, his condition had improved and he was thereafter determined to be competent to stand trial. On the eve of defendant’s second trial, the People sought permission to introduce at trial the records from defendant’s stay at MHFPC, which defendant strenuously opposed. Following argument and assurances from the People that the information in the records would be elicited through the testimony of Quazi Al-Tariq, the psychiatrist who was assigned to defendant during his stay at MHFPC, County Court ruled that the records could be used at trial.[1]
Following a second jury trial, defendant’s affirmative defense was again rejected and he was found guilty of murder in the second degree. Defendant was thereafter sentenced to a term of imprisonment of 25 years to life and he now appeals. For the reasons that follow, we conclude that various errors once again deprived defendant of a fair'trial and, as a result, we reverse.
Initially, we reject defendant’s contention that the jury’s verdict was against the weight of the evidence. In cases such as this where a different verdict would not have been unreasonable, we must, “like the trier of fact below, ‘weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony’ ” and, “[i]f it appears that the trier of fact has failed to give the evidence the weight it should be accorded, [we] may set aside the verdict” (People v Bleakley, 69 NY2d 490, 495 [1987], quoting People ex rel. MacCracken v Miller, 291 NY 55, 62 [1943]; see People v Danielson, 9 NY3d 342, 348 [2007]). Regarding a defendant’s sanity, it is well settled that the trier of fact has the right to accept or reject the testimony of any expert, or any portion thereof (see People v Stoffel, 17 AD3d 992, 993 [2005], lv denied 5 NY3d 795 [2005]; People v Gilbert, 103 AD2d 967, 968 [1984]). Generally, “where, as here, there is conflicting expert evidence, the issue of a defendant’s criminal responsibility is for the jury to resolve” (People v Tillman, 260 AD2d 656, 657 [1999]; see People v Wood, 12 NY2d 69, 77 [1962]; People v Schmidt, 216 NY 324, 340 [1915]; People v Stoffel, 17 AD3d at 993), and we will intervene only when there is a “ ‘serious flaw’ in the testimony offered by the People’s expert” (People v Tillman, 260 AD2d at 657, quoting People v Enchautegui, 156 AD2d *193 461, 461 [1989], lv denied 76 NY2d 787 [1990]; see People v Irizarry, 238 AD2d 940, 941 [1997], lv denied 90 NY2d 894 [1997]; People v Justice, 173 AD2d 144, 146 [1991]; People v Mainville, 59 AD2d 809, 809-810 [1977]).
Turning to the evidence adduced at trial, the basic facts of defendant’s history and the events surrounding his murder of the victim are undisputed. As various members of defendant’s family related at trial, defendant’s behavior began to change in 2003, when he was 20 years old. For example, he quit his job and became more “seclusive.” Defendant also began carrying a sword and claiming to be King Arthur, in search of the Holy Grail and “no longer of this world,” and he routinely quoted from the Bible. As a result of this behavior, his parents brought him to the secure psychiatric unit of Berkshire Medical Center in July 2003. Following this stay, defendant’s behavior deteriorated, leading to his hospitalization at the secure psychiatric unit a second time for a few days in June 2004 and a third time at the beginning of July 2004; the latter stay lasted more than two weeks due to the fact that defendant threatened his mother when she expressed concern over his possible release after a week. Subsequent to his release from the third hospitalization, similar behaviors manifested over the next year and a half, with defendant alternating claims that he was Merlin, King Arthur, the “Bear King” or Jesus. Defendant began wearing all black, got a tattoo on his forehead — which he said was Merlin’s marking — fasted for 40 days, stopped sleeping, planned to live in a cave in the woods, was preoccupied with the Bible and Arthurian legends, and talked frequently about the world ending. His family became increasingly troubled by defendant’s behavior and concerned for his safety and that of others. Finally, on February 3, 2006, his grandmother took him to be hospitalized once again at the psychiatric unit. While there, the process to have defendant involuntarily committed was begun by the facility’s staff.
On February 9, 2006, defendant escaped from the secure psychiatric unit and made his way to his cousin John Hobart’s house. As set forth in defendant’s written confession, Hobart drove him to Columbia County and dropped him off near the victim’s home on the morning of February 11, 2006. Defendant was admitted into the residence by the victim and, after a brief conversation, pulled out a pocket knife and repeatedly stabbed him in the chest. After the victim pleaded for his life, defendant looked into his eyes in order “to see his soul” and told him that *194 “[he was] already dead.” Defendant then took a second weapon — a glass paperweight secured in the toe of a sock — from his pants pocket and bludgeoned the victim until defendant “could see his brain coming out of his ear.” After this, defendant soaked the weapons in the sink while he took various items from around the victim’s home — including a sleep apnea machine, a box of harmonicas, car keys, a check, an article of clothing and approximately $270 — and proceeded to set the victim’s body on fire. Defendant then left the apartment after barricading its back door and locking the front door and walked to the prearranged place where Hobart was to pick him up.
Hobart dropped defendant at a motel in the Town of Schodack, Rensselaer County, where defendant rented a room using Hobart’s name. The following day, defendant entered a pharmacy and unsuccessfully attempted to barter some costume jewelry for morphine. Next, he went into a Burger King and filled out an employment application, again using Hobart’s name. Defendant then hid in the bathroom when police entered the restaurant but, upon exiting the restaurant shortly thereafter, defendant approached the police with his hands up and asked them if they were looking for him. After a brief exchange in which defendant originally gave Hobart’s name and then admitted to his real name, he was detained and a pat down revealed the pocketknife and the paperweight in the sock. Defendant was then arrested, transported to the police station and ultimately placed in the Rensselaer County jail. However, the minor charges on which he was being held were dismissed and he was released from jail on February 15, 2006. Upon exiting the jail, defendant was approached by an investigator with the Columbia County Sheriffs Department and an agent with the Bureau of Alcohol, Tobacco and Firearms. Defendant agreed to talk to them and, after brief questioning, confessed to the victim’s murder. He later signed a lengthy written confession to what he called “Operation Cobra,” which he said was the “premeditated murder of the snake who was [the victim].”
Following the People’s undisputed establishment of the elements of second degree murder, the trial moved to defendant’s affirmative defense of insanity (see Penal Law § 40.15). Pursuant to the jury charge (see People v Danielson, 9 NY3d at 349), the burden was on defendant to prove, by a preponderance of the evidence, that, at the time of the murder, “as a result of mental disease or defect, [he] lacked substantial capacity to know or appreciate that such conduct was wrong,” mean *195 ing “against the law of the State of New York or . . . against commonly held moral principles, namely the law of God, or both.” Inasmuch as defendant concedes on this appeal that he cannot prove his inability to appreciate that his conduct was illegal (in fact, he concedes that he knew this), the issue distills to whether he established that he lacked the capacity to know or appreciate that it was morally wrong.
In support of his defense, defendant presented the testimony of three psychiatrists — Stuart Kleinman, Stephen Price and Thomas Qualtere — each of whom were qualified as experts at trial. Although they differed somewhat in their diagnoses, all of these experts, as well as the People’s expert, agreed that defendant suffered from a mental disease or defect at the time of the murder.[2] Importantly, among all the information gathered by defendant’s three experts and the People’s expert over the course of their examinations of him, defendant related a similar description to each of them of a “vision” he had upon his only encounter with the victim prior to the murder. Defendant detailed his visit to the victim’s house with Hobart, where he saw people buying drugs from the victim, and related that he then had a “vision” in which he saw the victim, whose eyes were “soulless,” crumbling to ash before him.
Turning to the expert testimony, Kleinman testified that he examined defendant over the course of two days in 2006, reviewed defendant’s records and prepared a report and supplemental report. Kleinman opined, to a reasonable degree of medical psychiatric certainty, that as a result of defendant’s mental illness, he was “substantially unable to appreciate that his action was not consistent with commonly held moral standards or principles.” According to Kleinman, defendant killed the victim while under the influence of “a psychotic belief that he was acting as a servant of God and completing a particular mission which was commissioned by God to him.” Kleinman further concluded that defendant was not malingering his mental illness or any aspects of his illness at the time of the murder.
Price testified that he examined defendant in multiple meetings from June to August 2006, reviewed defendant’s records and interviewed his mother and sister. Price opined that, at the time of the murder, defendant believed that he was on a mission *196 from God and did not know or appreciate that his conduct was against commonly held moral principles. Price also concluded that defendant was not malingering at the time of the murder.
Defendant’s third expert, Qualtere, testified that he conducted three interviews with defendant in November 2006 and reviewed defendant’s medical records, along with various other records and statements regarding defendant. Qualtere opined that, at the time of the murder, defendant “could not appreciate his actions were wrong” with respect to “the commonly held morals.” Qualtere further explained that, when defendant killed the victim, he “was operating under ... a significant delusional firm fixed false belief of being in the [medieval] times, of having a mission, of having the vision, having to end th[e] life of this serpent with the venom.”[3]
In rebuttal, the People presented the testimony of Alan Tuck-man, a psychiatrist who was qualified as an expert at trial. Tuckman met briefly with defendant on two occasions and reviewed defendant’s records. With regard to whether defendant knew that the murder was morally wrong, Tuckman opined that
“[l]egal and moral principles are really the same, with one exception. What you know as morally wrong you know is legally wrong and what’s legally wrong you know is morally wrong. . . . The only exception is where an individual’s beset with a hallucination that they got a specific direct command from God to do this for some psychotic reason.”
Tuckman then testified that “it was clear to [him] that [defendant’s] idea . . . that he got a message from God, was not truthful in the way he presented it to [Tuckman].” Tuckman did not believe defendant’s claim that he received a message from God because, during their interview, defendant described the “vision” he received as “a foresight” and “a premonition,” and this meant that it was “a feeling,” “a thought,” “a spur of the moment thing, rather than a specific statement from God.” Additionally, Tuckman concluded that certain aspects of defendant’s behavior at and around the time of the murder revealed an awareness on the part of defendant of the moral wrongness of his acts. Specifically, Tuckman emphasized that defendant “tried to hide the crime [and] evade prosecution” — by, among *197 other things, covering the victim’s body with a blanket, locking or barricading the doors to the victim’s apartment and giving a false name in the days following the murder — and stole items and money from the victim after the murder.
On cross-examination, Tuckman conceded that he “accepted] all of [defendant’s] mental illness and all of his delusions,” but that he did not accept “that [defendant] got a specific verbal direction from God to do this.” Tuckman also concluded that defendant was malingering aspects of his mental illness. Although he acknowledged that Al-Tariq’s examination of defendant was not intended to be a comprehensive psychiatric evaluation and did not include objective tests to diagnose malingering and that the January 2010 examination of defendant’s fitness to stand trial was distinct from defendant’s state of mind at the time of the crime, Tuckman testified that he found the records of defendant’s 2009-2010 stay at MHFPC and his discussion of defendant’s case with Al-Tariq to be relevant to his opinion because, “if [defendant was] malingering the same material four years back, there’s a good chance he was malingering the material [in 2006] too.” Notably, Tuckman conceded that he had originally opined in 2006 that defendant was not malingering.
While the issue of defendant’s sanity at the time of the murder is a very close question, it was squarely within the jury’s province to resolve questions of the relative credibility of the expert opinions related thereto and the jury could have rejected Tuckman’s testimony, but did not do so. Upon our review of the record, we cannot conclude that the jury failed to give the evidence its proper weight and we find no “serious flaw” in Tuck-man’s testimony that would cause us to forgo the general rule of deference in such matters and substitute our judgment for that of the jury (see People v Wood, 12 NY2d at 76-77; People v Trojan, 73 AD3d 818, 818-819 [2010], Iv denied 15 NY3d 810 [2010]; People v Stoffel, 17 AD3d at 992-993; People v Tillman, 260 AD2d at 657).
Notwithstanding our determination that defendant’s conviction was not against the weight of the evidence adduced at trial, we conclude that, under the circumstances of this case, defendant was deprived of “the cardinal right ... to a fair trial” and, therefore, reversal of his conviction and remittal to County Court is necessary (People v Crimmins, 36 NY2d 230, 238 [1975]). We first address County Court’s determination to permit Tuckman to testify as to his reliance on hearsay evi *198 dence and to allow a recitation of that evidence — specifically, the MHFPC records regarding defendant’s 2009-2010 stay and his competency to stand trial — and the admission at trial of statements made to Tuckman by Al-Tariq to support Tuckman’s opinion as to defendant’s malingering. By way of background, it is important to begin with County Court’s pretrial hearing regarding the People’s request to use the MHFPC records at trial and elicit the opinion of Al-Tariq as a basis for Tuckman’s opinion. The first concern raised by County Court was how the People “intended] to utilize the information if not bringing . . . Al-[Tariq] into the courtroom,” in response to which the People indicated that they intended to call Al-Tariq to testify at trial. Indeed, Al-Tariq was included on the People’s witness list. Only after the People’s assurance that the evidence in question would be elicited “[flirstly through . . . Al-[Tariq],” and after extensive argument regarding relevance, probative value and prejudice to defendant, did County Court rule that the People would be permitted to “utilize this information” at trial. County Court subsequently denied defendant’s pretrial motion to vacate its ruling after Al-Tariq’s anticipated testimony at trial was again acknowledged and discussed by both defendant and the People. Thus, the determination to allow the People to use the MHFPC records and Al-Tariq’s out-of-court statements based upon the anticipated trial testimony of Al-Tariq impacted and infected the elicitation of all the evidence bearing upon defendant’s affirmative defense of insanity — including the cross-examination and redirect examination of each of defendant’s three expert witnesses and the direct examination and cross-examination of Tuckman — in such a way that the People’s eventual decision, following the conclusion of Tuckman’s testimony, not to call Al-Tariq as a witness fundamentally deprived defendant of his right to a fair trial.
The prejudice to defendant is clearest with regard to the testimony elicited by the People from Tuckman on direct examination.[4] The statements and contents of the MHFPC records were undeniably damaging to defendant’s affirmative defense and affected the jury’s ability to properly assess the testimony *199 of the expert witnesses. In response to the People’s questions on direct examination, and without any foundation having been laid, Tuckman testified:
“I asked [Al-Tariq] about his findings with regard to [defendant] and whether he was malingering, as the [MHFPC] records described, and [Al-Tariq] said that, yes, that was our diagnosis throughout, our working diagnosis. Not to say he doesn’t have a mental illness, he does. He’s a mentally ill guy with strange thoughts and previous hospitalizations but he was faking or malingering this idea about being God and enjoying it when the other patients/inmates joked about it. So [the MHFPC staff] felt he was faking and malingering that information.”
This response was followed by the People’s inquiry as to whether Tuckman £‘kn[ew] if it was determined why [the MHFPC staff] determined [defendant] was faking or malingering at [MHFPC],” to which Tuckman answered, “Oh yes. It was in the record at [MHFPC]. It said that he’s malingering this mental illness in order to evade prosecution for his crime.” The People then immediately elicited Tuckman’s opinion with respect to defendant’s sanity on February 11, 2006, which differed from that of the other three experts at trial. The prejudice to defendant arising from the admission of this evidence is manifest and its probative value is minimal,[5] considering the remoteness in time and the two very different purposes for which defendant’s mental state was being assessed — namely, to determine his sanity on February 11, 2006 and to determine his competence to stand trial four years later.
As previously noted in connection with our weight of the evidence review, this was a very close case on the issue of defendant’s sanity at the time of the murder. The jury was presented with the testimony of four well-qualified experts, who were extensively examined and cross-examined. The circumstances here essentially resulted in evidence from a fifth expert — which was singularly favorable to the People’s case and supportive of *200 the opinion of the only expert that they called to the stand. In our view, with the scales so delicately balanced, the portions of the MHFPC records and Al-Tariq’s statements that were presented at trial “gave the People an unfair advantage which could very well have led the jury to accept their expert’s position” (People v Wood, 66 NY2d 374, 380 [1985]). While County Court did give the jury limiting instructions at certain points when the records and statements were being used, no such instructions were given at the point at which this evidence was most damaging to defendant’s case. Moreover, it is questionable whether the force of this evidence could have been minimized by mere limiting instructions when the promised basis for its use at trial never materialized. Inasmuch as these circumstances clearly impacted the preparation and presentation of defendant’s defense — from examination and cross-examination of the expert witnesses to whether and on what grounds to lodge objections — we cannot conclude that the impact on defendant’s trial was harmless (compare People v Rawlins, 37 AD3d 183, 184-185 [2007], affd 10 NY3d 136 [2008]), and “[s]uch prejudice cannot be countenanced” (People v Halikias, 106 AD2d 811, 813 [1984]; see People v Jiminez, 79 AD2d 442, 445-446 [1981]).[6]
In conjunction with the foregoing, we also conclude that the balance struck by County Court between the restrictions placed upon defendant’s cross-examination of Tuckman regarding an article he published on the subject of defendant’s first trial and the evidence that the People were permitted to elicit before the jury concerning an award he had won for that article was unduly prejudicial to defendant and impacted his right to a fair trial. Following defendant’s first trial — in which Tuckman also testified as the People’s expert — but prior to our reversal of his conviction, Tuckman published an article about defendant’s case and the meaning of the term “wrong” with regard to the insanity defense. In the article, Tuckman spoke favorably of a 2006 order of County Court (Czajka, J.) rejecting defendant’s plea and approved of the legal standard applied by the court, a standard we later found to be a “misapprehension of the law” (63 AD3d 34, 37 [2009], supra). At trial, defendant cross-examined Tuckman regarding his article, but defendant’s at *201 tempt to delve into the legal basis underlying Tuckman’s writing in an effort to explore Tuckman’s understanding of the insanity defense under New York law was rebuffed when County Court (Nichols, J.) sustained the People’s objection to it. However, the People’s first line of questioning on redirect succeeded, over defendant’s objections, in drawing out the fact that Tuckman’s article had won a national award. When defendant again attempted to explore Tuckman’s basis for the article on re-cross-examination, County Court sustained the People’s objection thereto.
In our view, this exchange resulted in a likelihood that the jury was left with an inappropriate and unwarranted impression that Tuckman’s opinion, by virtue of his article and award, was more worthy of belief and acceptance than that of the other experts who testified at trial. While the trial court generally has wide latitude in regulating the scope of cross-examination (see People v Hults, 76 NY2d 190, 199 [1990]), we are of the view that County Court abused its discretion in this case by permitting the fact of Tuckman’s award to be elicited at trial while, at the same time, restricting defendant’s opportunity to fairly impeach Tuckman on that subject. Overall, the questioning of Tuckman regarding the article and award as it transpired here was too likely to “confuse the main issue and mislead the jury” to defendant’s detriment with little probative value (People v Hayes, 17 NY3d 46, 53 [2011], cert denied 565 US —, 132 S Ct 844 [2011] [internal quotation marks and citations omitted]; accord People v Corby, 6 NY3d 231, 234 [2005]).
To be sure, “[i]t is impossible to know whether or to what extent the jury’s assessment of the experts’] testimony was prejudiced as a result” of the use of the MHFPC records, the admission of Al-Tariq’s statements and the testimony adduced regarding Tuckman’s article and award (Matter of State of New York v Andrew O., 16 NY3d 841, 844 [2011]; see People v Wood, 66 NY2d at 380). However, given the “close question on the issue of defendant’s mental state” (People v Wood, 66 NY2d at 378) and the “closely fought battle of fully qualified experts” that the jury was tasked with resolving (id. at 380), we find that these circumstances, taken as a whole, “operated to deny . . . defendant his fundamental right to a fair trial,” requiring that we reverse the judgment of conviction (People v Crimmins, 36 NY2d at 238).
One other issue merits brief comment. We are troubled by the admission of Tuckman’s testimony that defendant requested *202 counsel while in police custody (see People v Savage, 50 NY2d 673, 677-678 [1980], cert denied 449 US 1016 [1980]; People v Al-Kanani, 26 NY2d 473, 478 [1970]; People v Johnson, 70 AD3d 1188, 1190 [2010]; People v Hunt, 18 AD3d 891, 892 [2005]), although this issue was not preserved. Specifically, during Tuck-man’s testimony, the People asked him whether, during his examination of defendant, “there was any conversation concerning about whether he asked for a lawyer . . . when he talked to the police and gave the [11] page statement?” Tuckman responded that it was discussed and then related his discussion with defendant as follows:
“I said, ‘You know, you asked for a lawyer. If you said that you didn’t do anything wrong, why would you ask for a lawyer?’ Well, [defendant] said, ‘Well, maybe they thought I did something wrong.’ And I believe at one point I said, ‘You know, if you were on a mission from God and God told you, why would you need a lawyer? You’re on a mission from God.’ He didn’t answer that.”[7]
Had this issue been preserved, we would find that this exchange resulted in defendant’s invocation of his constitutional right to counsel being used against him to “create[ ] a prejudicial inference of consciousness of guilt” and was, therefore beyond the bounds of proper questioning by the People and permissible testimony by the People’s most critical witness (People v Hunt, 18 AD3d at 892; see People v Al-Kanani, 26 NY2d at 478; People v Johnson, 70 AD3d at 1190-1191).
Finally, defendant’s challenge to County Court’s suppression ruling is unpersuasive (see People v Strawbridge, 299 AD2d 584, 589 [2002], lv denied 99 NY2d 632 [2003]), and his remaining contentions are similarly without merit or academic.
Lahtinen, J.P, McCarthy and Garry, JJ., concur.
Ordered that the judgment is reversed, on the law, and matter remitted to the County Court of Columbia County for a new trial.

. These records included evidence that, among other things, defendant had been malingering his mental illness at the time of his examination by AlTariq.

. The diagnoses included schizoaffective disorder, paranoid schizophrenia and bipolar disorder, manic type.

. Each of defendant’s experts also testified that they reviewed the records from defendant’s 2009-2010 stay at MHPFC, and stated that such records did not alter their ultimate opinions.

. Some of the information from the MHFPC records and Al-Tariq was brought out during cross-examination and redirect examination of defendant’s experts prior to Tuckman’s testimony on the People’s rebuttal in an apparent attempt to neutralize or significantly soften the blow to defendant’s case. However, inasmuch as County Court’s pretrial ruling — permitting the admission of this evidence based upon, among other things, the People’s assurance *199 that Al-Tariq would testify — set a course for this trial that defense counsel was forced to navigate, counsel’s laudable endeavors to pilot through the hazardous waters that he faced should not operate to defendant’s detriment.

. Notably, although County Court had previously given limiting instructions to the jury when reference was made to the MHFPC records during cross-examination of defendant’s experts, no such instructions were given during this portion of Tuckman’s testimony, despite defendant’s objection to the testimony.

. Defendant failed to preserve his related claim that the admission of AlTariq’s statements through Tuckman’s testimony violated defendant’s rights under the Confrontation Clause (see People v Kello, 96 NY2d 740, 744 [2001]; People v Wright, 81 AD3d 1161, 1164-1165 [2011], lv denied 17 NY3d 803 [2011]). Were this issue before us, we would agree with such claim (see People v Goldstein, 6 NY3d 119, 127 [2005], cert denied 547 US 1159 [2006]).

. No limiting instruction was given by County Court.