People v Gilbert (2021 NY Slip Op 06003)





People v Gilbert


2021 NY Slip Op 06003


Decided on November 4, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:November 4, 2021

109990
[*1]The People of the State of New York, Respondent,
v
Sarra Gilbert, Appellant.

Calendar Date:September 15, 2021

Before:Garry, P.J., Egan Jr., Lynch, Aarons and Reynolds Fitzgerald, JJ.

John Ray, Miller Place, for appellant.
David J. Clegg, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered August 4, 2017, upon a verdict convicting defendant of the crime of murder in the second degree.
On July 23, 2016, defendant invited her mother (hereinafter the victim) over to her residence, where defendant fatally stabbed her over 200 times. As a result, defendant was charged by indictment with murder in the second degree. During the ensuing jury trial, defendant raised the affirmative defense of lack of criminal responsibility by reason of mental disease or defect (see Penal Law § 40.15), emphasizing that she had a mental illness and, at the time of the killing, did not appreciate the nature and consequences of her conduct or that such conduct was wrong. The jury rejected the affirmative defense and convicted defendant as charged. She was sentenced to a prison term of 25 years to life and appeals.
Defendant does not dispute that she killed the victim by stabbing her 227 times with a 15-inch knife, bludgeoning her with a fire extinguisher and spraying fire extinguisher foam into her mouth, thereby satisfying the actus reus components of murder in the second degree (see Penal Law § 125.25 [1]). The mens rea element of this crime was also established by defendant's trial testimony that she intended to kill the victim and the brutal nature of her conduct (see Penal Law §§ 15.05 [1]; 125.25 [1]; People v Steinberg, 79 NY2d 673, 682 [1992]; People v Terry, 196 AD3d 840, 842 [2021], lvs denied 37 NY3d 1027, 1030 [2021]). The dispute focuses on whether the jury could, on the record before it, reasonably reject defendant's affirmative defense that she lacked criminal responsibility by virtue of her mental disease or defect (see Penal Law § 40.15).
Defendant contends that the jury improperly rejected her affirmative defense and, therefore, the verdict is legally insufficient and against the weight of the evidence. A defendant will be absolved of criminal liability under Penal Law § 40.15 if, "at the time of the [criminal] conduct, as a result of mental disease or defect, [the defendant] lacked substantial capacity to know or appreciate either . . . [t]he nature and consequences of such conduct[] or . . . [t]hat such conduct was wrong" (see People v Marlett, 191 AD3d 1183, 1185 [2021], lv denied 37 NY3d 966 [2021]). The statute uses the term "know or appreciate" in a deliberate manner to "permit the defendant possessed of mere surface knowledge or cognition to be excused, and to require that he [or she] have some understanding of the legal and moral import of the conduct involved to be held criminally responsible" (People v Adams, 26 NY2d 129, 135 [1970] [internal quotation marks and citation omitted], cert denied 399 US 931 [1970]; see CJI2d[NY] Penal Law § 40.15). As an affirmative defense, the burden is on the defendant to prove these elements by a preponderance of the evidence (see People v Kohl, 72 NY2d 191, 193 [1988]; People v Marlett, 191 AD3d at [*2]1185). Even so, "placing this burden on the defendant does not relieve or transform the People's primary and constant burden of proving, beyond a reasonable doubt, all the elements of the crimes charged, including all components of the applicable culpable mental state element" (People v Kohl, 72 NY2d at 193-194). Where there is conflicting expert testimony, "the issue of a defendant's criminal responsibility is for the jury to resolve" (People v Demagall, 114 AD3d 189, 192 [2014] [internal quotation marks and citations omitted], lv denied 23 NY3d 1035 [2014]; see People v Hadfield, 119 AD3d 1217, 1222 [2014], lv denied 25 NY3d 989 [2015]), and "we will intervene only when there is a serious flaw in the testimony offered by the People's expert" (People v Demagall, 114 AD3d at 192 [internal quotation marks and citations omitted]).
With respect to the underlying incident, the evidence establishes that, on the afternoon of July 23, 2016, two police officers — Antonio John Bell and Alba Gonzalez — were dispatched to defendant's residence in response to a call from one of her sisters expressing concern. Upon arriving, the officers encountered the victim's car in the driveway and knocked on the doors and windows of defendant's residence. No response was forthcoming. In the interim, defendant's family members arrived at the scene and her sister — Sherre — informed Bell that defendant had called her that morning and told her that she was hearing voices. The victim's boyfriend eventually opened one of the windows to defendant's residence and observed the victim's deceased body on the floor. Bell then kicked in the door and entered, where he encountered defendant walking toward him while smoking a cigarette. As reflected in the footage from Bell's body camera — which was played for the jury at trial — defendant immediately uttered, "I am under arrest." Bell testified that, when he inquired further, defendant stated in a soft voice, "I killed my mom,"[FN1] but later maintained that the victim was still alive.
The People also elicited testimony from Gonzalez regarding defendant's statements and demeanor following the killing. Gonzalez revealed that, upon entering defendant's residence, she and Bell placed defendant in handcuffs and ordered her to stand in the kitchen while they secured the crime scene. During that time, defendant informed Gonzalez that, prior to the killing, she had been hearing voices that referred to the victim as the "devil" and a "bad God," and that directed her to kill the victim. However, later during their interaction, defendant asked Gonzalez, "[S]he's still alive, right?" and stated, "[I]s this like a joke? I know something is going to happen. My mom is not dead. My mom is not dead." She also relayed to Gonzalez that she had not slept the night before because rain had fallen from the ceiling. The jury also heard testimony that, while speaking with Gonzalez, defendant asked that her family be moved away from the scene [*3]and mistook the chirp of a fire alarm battery for a voice.
After the crime scene was secured, defendant was arrested and taken to the police station, where she was read her Miranda rights. The People played for the jury a recorded interview of defendant's investigatory questioning while there. In response to a detective's question about whether defendant knew why she was being interrogated, defendant responded, "I murdered my mother." Defendant then recounted the circumstances precipitating the killing, explaining that she had asked the victim to come to her house that morning and, when the victim arrived, told her that she had been hearing voices. Defendant explained that she began "stabbing [the victim] to death" under the impression that she was the source of the voices, stating that she thought she "had to" in order to stop them and referring to the victim as a "bad God." Defendant also told detectives that she wanted to kill the victim when she called her that morning but did not think she had the "audacity" to do so. She confirmed that, at the time of the killing, she felt like stabbing the victim was the right thing to do, but "fe[lt] really bad" about it afterwards. As depicted in the video footage, defendant answered in the affirmative when detectives asked whether she was still hearing voices following the victim's death and agreed with them that, even if the voices had stopped, stabbing the victim "would still have been the wrong thing to do."
The People also called Stevie Nickole Smith, defendant's younger sister, to testify as a fact witness. Smith indicated that defendant had a strained relationship with the victim, who had obtained custody of defendant's son following a February 2016 incident in which defendant drowned a puppy in front of the child. According to Smith, defendant was upset that the victim had obtained custody of the child and believed that monetary motivations influenced that decision. Smith also emphasized that the victim did not get along with defendant's former boyfriend. Smith also noted that defendant was not always medication compliant, had been in and out of psychiatric hospitals on numerous occasions, had assaulted nurses and residents during her hospital stays, and had attacked the victim and Sherre less than a year prior to the victim's death. Smith testified that, prior to the underlying incident, she felt uncomfortable in defendant's presence and believed that defendant wanted to kill her, recalling an incident in which she went to defendant's apartment and there was "a big kitchen knife" next to her.
With respect to defendant's mental health history, the record reveals that she began exhibiting psychotic symptoms well before this incident. To that end, defendant entered into evidence medical records documenting diagnoses of schizophrenia and schizoaffective disorder (bipolar type) and revealing that she had been hospitalized at least seven times prior to this incident, including in the [*4]weeks leading up to it. The conduct precipitating those hospital admissions include, among other things, a 2014 incident in which defendant referred to herself as "God," the February 2016 incident in which defendant drowned a puppy in front of her son based upon the belief that the puppy was the rapper Eminem and wanted to hurt her,[FN2] and an April 2016 incident in which defendant accused the victim of poisoning her.
The jury also heard about a journal that defendant kept, which included statements such as, "Control by demon eyes they lie and hide the truth and desires." The journal additionally stated that defendant was "God and powerful" and had the ability to "block all witchcraft" — an apparent reference to the victim who, Smith explained, practiced "white magic" while the children were growing up. The journal additionally referred to Smith and the victim as "husband and wife," stating that they would be "sent to hell with demons." Smith believed that the journal may have consisted of song lyrics and she did not recall defendant ever specifically referring to herself as God. Although Smith did not know when these entries were written, there was evidence indicating that defendant started keeping the journal in 2014.
Defendant took the stand and her mental health history was a prominent topic of her testimony. She explained that, when she was four years old, someone at a doctor's office told her that she was going to write music. After that experience, defendant began writing songs, maintaining that she wrote the first few verses of songs produced by famous musicians. Defendant further testified that, in November 2013, she was watching the American Music Awards when someone on the television mentioned "Legendary" as "a code name for somebody who wrote famous songs," believing that they were referring to her. She revealed that, in 2014, she was hospitalized in a psychiatric facility for approximately two months and, while there, "saw black in people's eyes," indicating that they were "demons." As to the incident with the puppy, defendant conceded that, when police arrived on that occasion, she deliberately lied to them about what had happened "[t]o avoid being arrested." She also questioned whether her older sister Shannon — who is believed to have been a victim of the Gilgo Beach serial killer — was actually deceased despite physical evidence confirming as much, and she testified that, at one point, she believed that she and Shannon had switched bodies.
With respect to this incident, defendant explained that she began hearing voices approximately five days prior. She testified that she intended to kill the victim when she arrived at her apartment on the morning of July 23, 2016, revealing her belief that the victim was "a bad God" and "evil." Defendant admitted that she stabbed the victim numerous times and, at one point, took a break to smoke a cigarette. Defendant testified that, during that break, the victim still appeared to [*5]be alive, describing that her eyes were open and her mouth was moving. Defendant further revealed that she cut the victim's clothing off because she "felt like they gave her more power and [she] [did]n't want her power." Given her belief that the victim was a "bad God," defendant maintained at trial that killing her was the right thing to do.
In addition to the foregoing evidence, defendant also retained Alexander Bardey, a forensic psychologist, as an expert witness. In anticipation of his testimony, Bardey reviewed defendant's medical records, interviewed her for four hours in January 2017, and watched the body camera footage from defendant's arrest. Bardey explained that defendant's psychosis began to manifest outwardly in 2014 and, over time, she became "significantly mentally ill." Bardey averred that defendant harbors "two sets of delusions" — one is her belief that she wrote a number of songs that famous musicians ultimately stole from her and the second is her belief that "she is God, or God-like" and is "[c]hosen by God to bring people to heaven, and fight the devil." Bardey testified that the victim and "her witchcraft" were also the topic of defendant's delusions.
As to defendant's mental state around the time of the incident, Bardey explained that defendant was supposed to be given injections of psychiatric medications at the beginning of each month, but she was not administered her medication in July 2016 and her "psychosis progressed." To that end, defendant told Bardey that, the night before the incident, she began hallucinating green lights and started "to see cars on the wall," "to feel that her rug was soaked in urine" and "to feel rain coming down on her in her apartment." Defendant also told Bardey that she had called the victim to come over to her apartment and, when the victim arrived, she saw black in the victim's eyes and asked the victim whether she was a "bad God" — a question that the victim did not answer. According to Bardey, this omission "confirmed [for defendant that the victim] was, in fact, a bad God, and it was her duty to stab her and kill her." Emphasizing that defendant had stabbed the victim 227 times and tried to decapitate her, Bardey maintained that it would have been "hard to maintain that level of energy and drive . . . unless [defendant] was driven by . . . psychosis." Further demonstrating defendant's delusional thinking, Bardey noted that defendant continued to believe that the victim was alive even after stabbing her so many times, thought the victim was "chanting, or doing incantations" during the encounter, and had taken the victim's clothing off under the impression that they gave her power. Moreover, Bardey noted that the footage from Gonzalez's body camera showed defendant mistaking the chirp of a smoke alarm battery for the sound of voices. He ultimately opined, with a reasonable degree of medical certainty, that defendant was suffering from acute symptoms of schizophrenia at the [*6]time of the killing, lacked the substantial capacity to understand the nature and consequences of her actions or that they were wrong, and believed that she was killing a demon rather than her mother. Although Bardey did not believe that defendant was malingering,[FN3] he conceded that she "maintained an ability to lie, even if she was psychotic."
In rebuttal, the People offered the expert testimony of Sandra Antoniak, a psychiatrist who met with defendant on two occasions and reviewed her medical records. Antoniak noted that, in addition to grappling with serious mental health diagnoses, defendant also struggled with drug abuse in the years prior to the killing. Nevertheless, no illegal drugs or alcohol were present in her system on the date of the incident.[FN4] During their discussions, defendant relayed to Antoniak that she had a strained relationship with the victim, whom she described as "neglectful." To that end, defendant told Antoniak that her "positive relationship[]" with the victim had ended after the puppy incident because she blamed the victim for the charges brought against her in relation thereto. Defendant also told Antoniak that, a day before the killing, she heard a "disembodied robotic alien type voice saying sooo, sooo, sooo or talk, talk, talk," and also saw a green light and felt rain falling from the ceiling. Antoniak also recalled defendant telling her that she thought the victim might have been the source of her hallucinations and that, when the victim arrived at her residence on July 23, 2016, she believed that the victim was an "evil [G]od." Antoniak remembered defendant telling her that she first stabbed the victim "in the upper chest over the heart because she knew that that would be the most lethal place to stab her" and that she "wanted her dead." According to Antoniak, defendant also revealed that, when police arrived on scene, "she knew that they were going to find [the victim] so she got up[,] . . . went down the hallway, . . . felt that her jogging pants had soaked up too much of the blood[,] . . . so she shed them . . . [and] went into the bathroom where she washed her hands and sat in the bathtub." After speaking with defendant and watching the body camera footage, Antoniak suspected that defendant was malingering and Antoniak performed the Miller's Forensic Assessment of Symptoms Test (hereinafter M-FAST) to confirm her suspicion. Defendant obtained a score of 5 on the M-FAST, which, according to Antoniak, indicated with 97% accuracy that she was malingering. Although Antoniak conceded that her written report found the need for further evaluation with a more comprehensive study, no such follow-up testing was performed. Antoniak agreed that defendant suffered from a mental illness at the time of the killing, but ultimately opined that she "did not lack the substantial capacity to tell the nature and consequences of her actions or that such conduct . . . [was] wrong."
We have no doubt that defendant suffers [*7]from a debilitating mental illness that blurs the lines of fiction and reality, and we are certainly sympathetic to the difficult life circumstances she has endured. The proof, however, reasonably supports the jury's finding that, at the time of the killing, defendant had the substantial capacity to know and appreciate both the nature and consequences of her conduct and that such conduct was wrong. Although defendant oscillated between telling the responding police officers that she had killed the victim and maintaining that the victim was not in fact deceased, she testified at trial that her objective was to kill the victim when she stabbed her. Moreover, Antoniak recalled defendant informing her that she initially stabbed the victim in the chest because she knew it was the most lethal place to inflict a wound. This evidence supports a finding that defendant possessed the substantial capacity to know and appreciate the nature and consequences of her actions (see People v Demagall, 63 AD3d 34, 38 [2009], lv denied 12 NY3d 924 [2009]; People v Moss, 179 AD2d 271, 273 [1992], appeal dismissed 80 NY2d 932 [1992]).
Whether defendant had the substantial capacity to know and appreciate that her conduct was wrong presents a closer question. Defendant proffered compelling evidence that, at the time of the killing, she believed that the victim was a demon and that she was ordained by God to kill her. If believed, such proof would have been sufficient to absolve her of criminal liability (see William C. Donnino, McKinney's Cons Laws of NY, Book 39, Penal Law § 40.15 at 32 ["where a father, suffering from a mental disease, believes that God requires him to offer up his child as a sacrifice, and does so, his intent to kill is plain; but, equally plain is his incapacity to know or appreciate that his conduct is wrong"]; see also People v Schmidt, 216 NY 324, 339-340 [1915] ["If . . . there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he (or she) knows the act to be wrong"]). The People, however, presented equally plausible evidence to the contrary, including Antoniak's expert opinion that defendant was malingering and possessed the requisite mental capacity to be held criminally responsible — an opinion which the jury was free to credit (see People v Reese, 166 AD3d 1057, 1060-1061 [2018], lv denied 33 NY3d 953 [2019]; People v Hadfield, 119 AD3d at 1223).
Defendant argues that there was a "serious flaw" in Antoniak's testimony that justifies disregarding it (People v Demagall, 114 AD3d at 192), emphasizing that Antoniak did not track the statutory language of Penal Law § 40.15 when rendering her opinion. In that regard, Antoniak opined that defendant lacked "the substantial capacity to tell the nature and consequences of her actions or that such conduct . . . [was] wrong" (emphasis added), rather than using the phrase "know or appreciate" as set [*8]forth in Penal Law § 40.15. Antoniak's failure to use the precise statutory language "went 'to the weight to be given the evidence rather than its admissibility'" (People v Whittemore, 185 AD3d 1528, 1529 [2020], lv denied 36 NY3d 977 [2020], quoting People v Taylor, 75 NY2d 277, 291 [1990]). In the context used by Antoniak, to "tell" means to "recognize" (Merriam-Webster Online Dictionary, tell, https://www.merriam-webster.com/dictionary/tell). As explained in the Criminal Jury Instructions, to "know or appreciate" means "to have some true understanding beyond surface knowledge" (CJI2d[NY] Penal Law § 40.15). The meaning of these terms are comparable. Even accepting, arguendo, that Antoniak's phrasing suggested that defendant possessed only surface level knowledge that her conduct was wrong — an awareness that would be insufficient to hold her criminally responsible (see People v Adams, 26 NY2d at 135) — we note that County Court's charge to the jury used the exact language of Penal Law § 40.15 and accurately explained the more nuanced meaning of "know or appreciate" as set forth in the Criminal Jury Instructions (see People v Whittemore, 185 AD3d at 1529).
In these circumstances, we are satisfied that the jury fully understood the components of the affirmative defense and could reasonably choose to credit Antoniak's opinion over Bardey's (see People v Demagall, 114 AD3d at 197). Independent evidence also supports the proposition that defendant possessed more than a surface understanding that her conduct was wrong, including that she hid in the bathroom when police initially arrived at the scene, requested that her family be moved away, stated to detectives that she felt bad about her actions, agreed with detectives that stabbing the victim would still have been wrong even if the voices had ceased thereafter and received a positive score for malingering on the preliminary M-FAST test. Accordingly, we discern no basis upon which to disturb the jury's rejection of defendant's affirmative defense.
Also unavailing is defendant's contention that Antoniak was unqualified to give expert testimony and that County Court abused its discretion in permitting her to do so. "The admissibility and scope of expert testimony is addressed to the sound discretion of the trial court, which must assess whether the witness possesses adequate skill, training, education, knowledge or experience to proffer it" (People v May, 188 AD3d 1309, 1310-1311 [2020] [internal quotation marks and citations omitted], lv denied 36 NY3d 974 [2020]; see People v Lee, 96 NY2d 157, 162 [2001]; People v Godallah, 132 AD3d 1146, 1150 [2015]). When Antoniak took the stand, the People began by inquiring into her qualifications, exploring her educational background, credentials and work experience. Antoniak revealed that she had a medical degree, was board-certified in psychiatry and had a Master's degree in forensic science. She further explained that she was employed at a large [*9]community clinic in Orange County and also worked at the Orange County Jail as a primary psychiatric provider for incarcerated individuals. When the People began questioning Antoniak about her interactions with defendant, defense counsel objected for "[l]ack of foundation as to expertise." County Court then permitted defense counsel to conduct voir dire of Antoniak, during which she revealed that, although she had never previously testified as an expert in a criminal action, she had testified as an expert in civil commitment proceedings 70 to 100 times. Following voir dire, defense counsel renewed his objection and the court permitted the People to continue their direct examination of Antoniak, effectively overruling the objection.
At oral argument before this Court, defense counsel took issue with County Court's failure to explicitly certify Antoniak as an expert witness before permitting her to opine on defendant's mental state at the time of the killing. However, County Court "was not required to [formally] declare or certify on the record that [Antoniak] was an expert before permitting [her] to testify" (People v Tetro, 175 AD3d 1784, 1787 [2019] [internal quotation marks and citations omitted]; see People v Andrade, 172 AD3d 1547, 1552 [2019], lvs denied 34 NY3d 928, 937 [2019]; People v Lamont, 21 AD3d 1129, 1132 [2005], lv denied 6 NY3d 835 [2006]; People v Leung, 272 AD2d 88, 89 [2000]; People v Gordon, 202 AD2d 166, 167 [1994], lv denied 83 NY2d 911 [1994]). Rather, as occurred here, it was sufficient that Antoniak "testif[ied] as to . . . her qualifications and that the trial judge instruct[ed] the jury as to the method of evaluating expert testimony" (People v Grajales, 294 AD2d 657, 659 [2002], lv denied 98 NY2d 697 [2002]; see CJI2d[NY] Expert Witness). By denying defense counsel's objections regarding Antoniak's expertise, the court "'implicitly indicat[ed] [its] discretionary acceptance of [Antoniak's] opinion as 'expert testimony' in her applicable field'" (People v Tetro, 175 AD3d at 1787, quoting People v Gordon, 202 AD2d at 167) — a decision we cannot conclude was an abuse of discretion given Antoniak's specialized qualifications and experience (see People v May, 188 AD3d at 1311; People v Brown, 128 AD3d 1183, 1188 [2015], lv denied 27 NY3d 993 [2016]).
We further reject defendant's argument that Antoniak's testimony should have been stricken due to certain discrepancies between her trial testimony and her post-interview written report, and minor errors in her written report pertaining to the date of the incident and the manner in which she described the affirmative defense at issue. The discrepancies and errors identified by defendant were thoroughly explored during cross-examination and went to the weight, rather than the admissibility, of Antoniak's testimony (see People v Whittemore, 185 AD3d at 1529; People v Pascuzzi, 173 AD3d 1367, 1375 [2019], lv denied 34 NY3d 953 [2019]; People v Miller, 239 AD2d 787, 788-789[*10][1997], affd 91 NY2d 372 [1998]). Defendant's remaining contentions, to the extent not specifically addressed herein, have been considered and found lacking in merit.
Garry, P.J., Egan Jr., Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant's alleged statement in this respect is not clearly discernable in the body camera footage, but Bell was cross-examined about this issue and maintained that defendant made that statement.

Footnote 2: There was evidence that, after defendant drowned the puppy, she purchased a knife, drove her son to the woods, showed him the knife and said "don't tell anybody what mommy did."

Footnote 3: Bardey explained that malingering means "the intentional faking or exaggerating of psychiatric symptoms" for the purpose of being absolved of criminal responsibility.

Footnote 4: According to Antoniak, a small amount of the prescription medication Abilify was present in defendant's system on the date of the killing.