People v Leppanen (2023 NY Slip Op 03946)

People v Leppanen

2023 NY Slip Op 03946

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

110611
[*1]The People of the State of New York, Respondent,
v
Andrell Leppanen, Appellant.

Calendar Date:June 1, 2023

Before:Egan Jr., J.P., Lynch, Aarons, Fisher and McShan, JJ.

Timothy S. Brennan, Schenectady, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the Supreme Court (Michael V. Coccoma, J.), rendered January 22, 2018 in Schenectady County, upon a verdict convicting defendant of the crimes of murder in the second degree and assault in the first degree.
In August 2016, defendant was involuntarily admitted into a local hospital's psychiatric crisis center for strange thoughts, feeling like he wanted to hurt people and saying that he felt "a storm coming." After being discharged and evaluated on two separate occasions but not admitted in either instance, in the early morning hours of August 26, 2016, defendant set his stepfather (hereinafter the victim) on fire by pouring gasoline on him while he slept and using a lit cigarette and a lighter to ignite the accelerant. Defendant fled and was arrested two days later, after he checked himself into a hospital for mental health treatment. He was arrested there and taken to a police station, where he received Miranda warnings and was interviewed by the police. During the videorecorded interrogation, defendant confessed to setting the victim on fire. Approximately two months later, the victim succumbed to his injuries and, in November 2016, defendant was charged by a superseding indictment with murder in the second degree (count 1), two counts of assault in the first degree (counts 2 and 3), arson in the fifth degree (count 4) and criminal mischief in the fourth degree (count 5).
At his arraignment, defendant served a notice of intent to present psychiatric evidence and subsequently consented to an examination by a psychiatrist or licensed psychologist (see CPL 250.10 [2], [3]). Thereafter, defendant moved to suppress certain statements made to the police during his initial arrest, which, after a Huntley hearing, was denied by County Court (Sypniewski, J.). The matter was removed to Supreme Court (Coccoma, J.) and the results of the psychiatric evaluation concluded that defendant, at the time of the incident, "did possess substantial capacity to understand the nature and consequences of his acts or that they were wrong." The matter proceeded to a jury trial where, despite advancing certain arguments and presenting relevant evidence related to defendant's mental health, defendant ultimately did not pursue the affirmative defense of not responsible by reason of mental disease or defect (see Penal Law § 40.15). Defendant was found guilty of count 1 (see Penal Law § 125.25) and count 2 (see Penal Law § 120.10 [1]) and acquitted of the remaining charges. Defendant was sentenced, as a second violent felony offender, to a prison term of 25 years to life on count 1 and to a concurrent prison term of 25 years to be followed by five years of postrelease supervision on count 2. Defendant appeals.
Initially, defendant failed to preserve his challenge to the legal sufficiency of the evidence supporting his convictions, inasmuch as he failed to renew his motion for a trial order of dismissal at the close of his case (see People v Truitt[*2], 213 AD3d 1145, 1146 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]). However, because defendant also argues that his convictions are not supported by the weight of the evidence, we nevertheless must determine whether the People proved each element of the crimes beyond a reasonable doubt (see People v Shabazz, 211 AD3d 1093, 1094 [3d Dept 2022], lv denied 39 NY3d 1113 [2023]). In doing so, a weight of the evidence analysis requires us to "first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Rivera, 212 AD3d 942, 944 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]). Further, "we view the evidence in a neutral light and defer to the jury's credibility assessments" (People v Paige, 211 AD3d 1333, 1334 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1143 [2023]).
As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]; see People v Quinn, 210 AD3d 1284, 1285 [3d Dept 2022], lv denied 39 NY3d 1079 [2023]). For a conviction of assault in the first degree, the People must prove that, "[w]ith intent to cause serious physical injury to another person, [the defendant] cause[d] such injury to such person or to a third person by means of . . . a dangerous instrument" (Penal Law 120.10 [1]; see People v Decamp, 211 AD3d 1121, 1122 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]). "Intent may be inferred from the defendant's conduct and the surrounding circumstances" (People v Stines, 212 AD3d 883, 885 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]). However, "[i]nasmuch as evidence of mental illness may negate a specific intent necessary to establish guilt, it is possible for an individual . . . to present evidence at trial that he or she was mentally ill at the time of the incident and, thus, did not possess the requisite intent to commit the crime" (People v McCray, 96 AD3d 1160, 1161 [3d Dept 2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 1104 [2012]; see generally People v Diaz, 15 NY3d 40, 46-47 [2010]). Therefore, "where, as here, there is conflicting expert evidence, the issue of a defendant's criminal responsibility is for the jury to resolve" (People v Demagall, 114 AD3d 189, 192 [3d Dept 2014] [internal quotation marks and citation omitted], lv denied 23 NY3d 1035 [2014]).
With respect to the underlying incident, the evidence adduced at trial established that the victim was sleeping in his bedroom when defendant poured gasoline on him [*3]and chased him throughout the house before igniting the accelerant with a cigarette and a lighter. Various neighbors testified that they witnessed the victim engulfed in flames and suffering from severe burns all over his body. One neighbor testified that the victim specifically kept repeating, "why would [my son] do this to me?" Multiple first responders testified as to the severity of the physical injuries sustained by the victim as a result of being lit on fire. The victim confirmed to a detective at the scene that defendant was the individual who set him on fire. There was further medical testimony as to the severity of the victim's bodily injuries, and the medical examiner testified that the victim died approximately two months after the incident and, based on his autopsy examination, that the cause of death was directly attributed to the burn injuries suffered from being set on fire. Defendant's general motion for a trial order of dismissal as to count 1 and count 2 was the only challenge to these facts.
As it relates to defendant's mental health and capacity to form the requisite intent, it was undisputed at trial that defendant had a well-documented history of mental health concerns and previous crises dating back to at least 2013. This included various diagnoses, pertinently bipolar disorder, schizophrenia and depression. The jury heard testimony from several mental health professionals and witnesses, including defendant's mother, relating to defendant's mental health concerns and his capacity before and after the incident. Specifically, several psychiatrists testified that, in the months leading up to the incident, they treated defendant for various mental health conditions, including on August 10, 2016, when he was involuntarily admitted to the crisis center. According to one psychiatrist, defendant's admission assessment on that date reported that defendant was having violent dreams and that he felt like hurting people after waking up. The assessment further noted that defendant's mother dropped him off at the facility, expressing concern for the safety of others and that defendant "will become violent and hurt somebody as he has in the past when he decompensates."
Defendant was discharged two days later and, in the following weeks, returned to the hospital twice but was not admitted either time. According to a different psychiatrist at a local hospital's mental health clinic who evaluated defendant on August 22, 2016, although defendant had previously been hearing voices, feeling paranoid, having hallucinations and had a thought process disorder, at the time of his evaluation, defendant had not been experiencing these symptoms. The psychiatrist agreed that defendant was "doing quite well" and that defendant was non-psychotic, not agitated, alert, fully conscious and was not suffering from delusions. He further recalled that this was a "fairly long appointment" because of the concerns of defendant's mother, however, the psychiatrist [*4]found none of the symptoms complained of were present during his evaluation. In contrast to this, the jury heard the testimony of defendant's mother, who explained that defendant had several episodes of mental health crises in August 2016 — including on August 22, 2016, when he was not admitted despite her pleas for the hospital to treat him. According to her, defendant was "acting up" in the days before the incident and, after the facility would not admit defendant and he returned home, that he was acting "distant" to her before he set the victim on fire.
Following the incident, defendant was taken from the mental health facility that he had checked himself into and brought to the police station. Although a detective testified that defendant was lethargic, tired and fell asleep at least once during the interrogation — which was recorded on videotape and played for the jury twice — neither the detective nor another police officer participating in the interrogation suspected that defendant had an altered mental state, either due to intoxicants or psychosis.[FN1] During the interrogation, defendant ultimately confessed to setting the victim on fire, explaining that he went outside to let the dog out, saw the gasoline and a pot, had a cigarette and then decided to pour gasoline on the victim and light him on fire. After the interrogation, defendant was remanded to a jail where a licensed clinical social worker employed there testified that defendant appeared to be "mildly delusional" and believed that others could read his thoughts, but his insight and judgment was rated from poor to fair during his period of incarceration there before trial.
The most notable testimony at trial was from each side's expert witnesses. Defendant's expert witness was a licensed psychologist who reviewed defendant's relevant medical history and interviewed him in March 2017. According to the expert, the medical record establishes that defendant was suffering from several mental health concerns or impairments before the incident. This includes delusions, hallucinations and deficient impulse control when defendant was involuntarily admitted on August 10, 2016. The expert testified, based on his interview, that defendant loved the victim but always felt "judged" by him because of defendant's sexual orientation. To that end, the expert believed that on August 25, 2016, defendant was suffering a bipolar episode with manic features because he had a "pervading sense of being judged and dismissed and not accepted with regard to his sexuality." The expert also "imagined" that defendant was suffering from delusions and struggling with impulse control that night, which carried over into the morning of the incident because defendant woke up "rageful" and had "a night of really disturbing violent dreams." Based on these statements during the interview, and how defendant woke up and followed his morning ritual and then connected the gasoline, pot and cigarette together while in this state [*5]of rage, the expert testified that defendant was suffering from a bipolar disorder episode and had acted out on impulse when he set the victim on fire. Further, the expert testified that, two days later when he checked into a local hospital and was subsequently arrested, defendant was "still in the midst of his manic episode," given the medical records indicating racing thoughts and psychotic symptoms.
On cross-examination, the expert admitted that the records indicated some friction between defendant and the victim, including that the victim expressed a desire that defendant find new living arrangements days before the incident. This resulted in an exchange between the victim and defendant on August 25, 2016, whereby the expert testified that the victim "said something on the order of that he could kill [defendant]." To that extent, the expert testified that the "fight" was not a single incident, but an increasingly "conflictual, tense relationship that has existed for some period of time" before the incident. Despite the episode, the expert conceded that defendant told the police during his interrogation a "[f]airly detailed account" of the incident, including his thought process that "[i]t was life or death, him or me."
The People's rebuttal expert witness was a psychiatrist who reviewed defendant's relevant medical records and interviewed him in June 2017. The rebuttal expert acknowledged that defendant had a history of mental illness and certain conditions that may cause troubling episodes, including a prior incident where defendant had stabbed an individual with a pen and a separate incident where he punched another person in the face for no apparent reason. However, the rebuttal expert distinguished the incident on August 26, 2016 as one being against a person — his stepfather — that he knew intimately and "had grown extremely angry at." Based on his review, the rebuttal expert testified that, despite the presence of mental illness, defendant "did not lack substantial capacity to understand the nature and consequences of his actions or that they were wrong." Specifically, the rebuttal expert explained that it was clear that defendant knew the consequences of what he did based on what he told the police, that he fled the scene and that, when he did seek medical help, he admitted to healthcare providers that he did something wrong. Additionally, the rebuttal expert recognized that the argument between defendant and the victim the night before the incident was significant, as it demonstrated that defendant was not acting impulsively, but rather that he realized he had choices with consequences. Further, the argument the night before also revealed defendant's motivation for his actions and that he acted in a purposeful manner to harm the victim, as the rebuttal expert reasoned that it was hard to conceptualize a sleeping person as an imminent threat and that, in chasing the victim around the house to ensure that the gasoline ignited, that defendant [*6]was consciously working to "finish his job."
Upon viewing the trial evidence in a neutral light, a different verdict as to murder in the second degree and assault in the first degree would not have been unreasonable, given the psychiatric testimony concerning whether defendant had the substantial capacity to know and appreciate the nature and consequences of his actions (see People v Gilbert, 199 AD3d 1048, 1055 [3d Dept 2021]; see also People v Stines, 212 AD3d at 887). Defendant presented compelling evidence of his mental illness, particularly as to how it affected him in the weeks prior to the incident and, according to his expert witness, the evening before, during and days after the incident. The People, however, presented equally plausible evidence to the contrary, including the rebuttal expert's opinion that defendant had the requisite mental capacity to be held criminally responsible because there were escalating tensions with the victim culminating in physical threats the night before the incident — a point acknowledged by defendant's expert witness. Further, the rebuttal expert's testimony supports the conclusion that defendant knew his conduct was wrong, as he fled the scene, hid for two days and admitted to healthcare providers that he did something wrong (see People v Gilbert, 199 AD3d at 1056). Inasmuch as "it is within the jury's province to credit the testimony of one expert over another" when considering a defendant's mental health defense (People v Reese, 166 AD3d 1057, 1060-1061 [3d Dept 2018], lv denied 33 NY3d 953 [2019]), we defer to the jury's resolution of credibility issues among the experts who testified and find that the weight of the evidence established that defendant intended to and caused the death of the victim (see People v Barreto, 64 AD3d 1046, 1048-1049 [3d Dept 2009], lv denied 13 NY3d 834 [2009]; see also People v Ashe, 208 AD3d 1500, 1505 [3d Dept 2022], lv denied 39 NY3d 961 [2022]). We similarly find that the weight of the credible evidence also supports the conclusion that defendant acted with intent to cause serious physical injury to the victim (see People v Stines, 212 AD3d at 887; People v Decamp, 211 AD3d at 1124).
Next, defendant argues that County Court should have granted his motion to suppress certain statements that he made to the police during his interrogation because he was questioned by a detective using the "Reid Technique" and due to his mental illness affecting the voluntariness of his Miranda waiver. Although defendant objected to the admission of these statements during the Huntley hearing, defendant did not raise the issue of the Reid technique and, "[h]aving failed to raise this specific argument in his motion papers or at the Huntley hearing as a ground for suppression, defendant did not preserve the issue for our review" (People v Weaver, 167 AD3d 1238, 1240 [3d Dept 2018], mod on other grounds 216 AD3d 1206 [3d Dept 2023]; see People v Valle, 70 AD3d 1386, 1387 [4th Dept 2010], [*7]lv denied 15 NY3d 758 [2010]; People v Wedekind, 200 AD2d 891, 892 [3d Dept 1994], lv denied 83 NY2d 1008 [1994]). As it relates to defendant's mental illness as a ground to suppress his statements, "[d]etermining whether a statement is voluntary is a factual issue governed by the totality of the circumstances and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v Logan, 198 AD3d 1181, 1184 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1162 [2022]; see People v Robinson, 156 AD3d 1123, 1130 [3d Dept 2017], lv denied 30 NY3d 1119 [2018]). A detective and a police officer testified at the suppression hearing that, on the date of the interrogation, defendant exhibited no signs of confusion, disorientation, illness or pain, but did appear to be lethargic and tired. Although defendant told the police that he was "high," neither the detective nor the officer detected any odors or observed any signs of intoxication. They further testified that defendant was read his Miranda rights, indicated that he understood them and initialed and signed a document setting forth those rights. Even though our review of the video footage from the interrogation raises concerns relating to the level of fatigue exhibited by defendant, he did not request to stop the interrogation and provided cognizant answers to the detective's and the officer's questions. Although there was a vigorous cross-examination by defense counsel at the Huntley hearing, "defendant did not testify nor offer any evidence, expert or otherwise, to support his contention that he did not comprehend his rights" (People v Garrand, 189 AD3d 1763, 1768 [3d Dept 2020], lv denied 36 NY3d 1120 [2021]).Based on the foregoing, and according deference to the credibility assessments of the suppression court who observed such cross-examination, we find that defendant's motion to suppress was properly denied (see People v Logan, 198 AD3d at 1184; People v Robinson, 156 AD3d at 1131).[FN2]
Next, we reject defendant's contention that his sentence is harsh and excessive. Although we have no doubt that defendant suffers from a debilitating mental illness, and we are certainly sympathetic to the difficult life circumstances that he has endured, the assault and murder of the victim was particularly heinous and cruel. Considering defendant's criminal history revealing that he has become increasingly more violent, his lack of remorse and that the victim's serious injuries resulted in his death two months after the incident, under these circumstances, we decline to disturb his sentence (see People v Calafell, 211 AD3d 1114, 1121 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Quinn, 210 AD3d at 1291).
Lastly, defendant contends that he was deprived of his right to the effective assistance of counsel. This argument is conclusory, as appellate counsel raises such contention "without any particular description or citation [*8]to the record" (People v Stines, 212 AD3d at 888; see People v See, 206 AD3d 1153, 1156 [3d Dept 2022], lv denied 39 NY3d 1075 [2023]). Nevertheless, "[v]iewing counsel's performance in its totality, including filing an omnibus motion, effectively cross-examining the People's witnesses, making relevant objections and delivering cogent opening and closing statements" and putting on a defense case which included expert opinion testimony, we find that defendant received meaningful representation (People v Hines, 214 AD3d 1117, 1121 [3d Dept 2023] [internal quotation marks, ellipsis, brackets and citation omitted], lv denied 39 NY3d 1155 [2023]). Furthermore, "defendant has not demonstrated on this record the absence of strategic reasons for defense counsel's conduct or that, had counsel taken the actions that defendant now points to, there was any likelihood of success" (People v Rivera, 212 AD3d at 949 [internal quotation marks and citations omitted]). We have examined the parties' remaining contentions and have found them to be without merit or rendered academic.
Egan Jr., J.P., Lynch, Aarons and McShan, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Defendant told the detective and the police officer that he was "high" during his interrogation, but they did not detect any specific odors or observe specific symptoms of intoxication.

Footnote 2: We recognize that defendant's statements to the police were significant, however, the defense strategy relied heavily on medical and expert testimony as to defendant's capacity and intent — not contesting the actual happening of the incident. Considering that the jury resolved this narrow issue against defendant, we find that there was other overwhelming proof of defendant's guilt elicited from the numerous witnesses and the victim, making any alleged error in failing to suppress defendant's statements to the police harmless beyond a reasonable doubt (see People v Diaz, 15 NY3d at 48; People v Slivienski, 204 AD3d 1228, 1236 [3d Dept 2022], lv denied 38 NY3d 1136 [2022]; see also People v Perez, 183 AD3d 934, 936-937 [3d Dept 2020], affd 36 NY3d 1093 [2021]; People v Williams, 176 AD2d 461, 461 [1st Dept 1991], lv denied 79 NY2d 833 [1991]).