People v Flynn (2024 NY Slip Op 06079)

People v Flynn

2024 NY Slip Op 06079

Decided on December 5, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 5, 2024

112750
[*1]The People of the State of New York, Respondent,
v
Bilal A. Flynn, Appellant.

Calendar Date:October 16, 2024

Before:Aarons, J.P., Reynolds Fitzgerald, Fisher, McShan and Mackey, JJ.

Kathy Manley, Selkirk, for appellant.
F. Paul Battisti, District Attorney, Binghamton (Joann Rose Parry of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the County Court of Broome County (Joseph F. Cawley, J.), rendered June 17, 2020, upon a verdict convicting defendant of the crimes of criminal possession of a controlled substance in the third degree (seven counts), criminal possession of a controlled substance in the fourth degree and criminally using drug paraphernalia in the second degree (two counts).
Defendant was charged by indictment with seven counts of criminal possession of a controlled substance in the third degree (counts 1-7), criminal possession of a controlled substance in the fourth degree (count 8) and two counts of criminally using drug paraphernalia in the second degree (counts 9 and 10), following the recovery of, among other things, cocaine, heroin, drug paraphernalia, two cell phones and almost $1,000 in cash during the execution of a search warrant on a residence owned by his girlfriend. Defendant moved to suppress the evidence seized pursuant to the search warrant, which such motion was denied by County Court. Following a jury trial, defendant was convicted as charged. County Court thereafter sentenced defendant, as a second felony offender, to a concurrent prison term of nine years, to be followed by three years of postrelease supervision, for each of his convictions of counts 1 through 7, and lesser concurrent terms of incarceration for his remaining convictions. Defendant appeals.
Defendant challenges the legal sufficiency and weight of the evidence as to counts 4, 5, 7 and 8. Initially, although defendant failed to preserve his challenge to the legal sufficiency of the evidence,[FN1] in conducting a weight of the evidence analysis, "we nevertheless must determine whether the People proved each element of the crimes beyond a reasonable doubt" (People v Leppanen, 218 AD3d 995, 996 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]). At trial, the People presented the testimony of several law enforcement officers who were involved in the investigation and the execution of the search warrant, as well as corresponding documentary, photographic and physical evidence. According to the testimonial evidence, upon execution of the search warrant, defendant was found alone in the residence and in a common area. A search of a closet in the primary bedroom resulted in the discovery of three plastic baggies containing different quantities of crack cocaine and powdered cocaine, and one "vented" jar containing a plastic baggie of heroin sitting on a quantity of rice. Some of the baggies were folded into a "knotted wrap" or "corner wrap," and all of these substances were confirmed in field tests, and then each weighed both in its original packaging and then by itself. A forensic scientist with the Southern Tier Crime Laboratory testified that, out of the four plastic baggies provided to her, she tested the two largest packages, in which one tested positive for the presence of cocaine and the other for heroin; each substance also had an aggregate weight in excess of one[*2]-half ounce.[FN2] A detective testified that drug sellers typically use knotted wraps to sell drugs and that the drug paraphernalia discovered in the closet next to the baggies — including two digital scales with a white residue, razor blades, two plastic "scoop" spoons, a dollar bill, rice, an empty jar, two plastic straws and a box of plastic fold-top sandwich bags — was consistent with drugs being sold. According to the detective, defendant was also searched and found to be in possession of approximately $1,000 in cash — the overwhelming majority of which were $20 bills, a common bill found on individuals when drugs are being sold. Other testimony indicated that a subsequent search of defendant's cell phones revealed a photograph taken of a knotted wrap and messages by defendant using certain drug vernacular, including known street names for drugs, and offers for specific amounts of drugs with prices that were consistent with what was recovered in the search. Much of this evidence was corroborated by the girlfriend, who testified for the People pursuant to a cooperation agreement, and who confirmed the types of drugs present and further explained that defendant would purchase the drugs in bulk, store them in the closet, and repackage the drugs into smaller baggies for selling as seen in the messages on his cell phone.
For his part, defendant testified that he had been warned by others about the girlfriend selling drugs, but ignored the warnings, had no idea that drugs were being sold in the home, and he had "never" seen her packaging drugs. He further denied being in possession of any of the drugs and ever going to purchase drugs in bulk to resell. Relating to the content on the cell phones, he contended that the drug-related communications had been made by his girlfriend and admitted that he took the photograph of a knotted wrap, but that he did so because he found it in the house, and he had sent it to the mother of his child. To that end, he further testified that he "loved" the house and really wanted to purchase it from the girlfriend's mother, but that she changed her mind and decided to sell it to her daughter instead of him — although he had made one payment toward purchasing it. He further testified that he was engaged in multiple businesses, and his full-time job was demanding and caused him to travel for long periods of time — including during the relevant time period, in which he was also hospitalized in Brooklyn for pneumonia.
In challenging the weight of the evidence, defendant contends that the two baggies of alleged drugs tied to counts 4, 5, 7 and 8 were never lab tested and, therefore based on People v Swamp (84 NY2d 725, 733 [1995]), the weight of the evidence is insufficient to sustain these convictions beyond a reasonable doubt. As charged here, defendant's convictions for possessing cocaine must be based upon evidence showing that he either knowingly and unlawfully possessed any amount "with intent to sell it" under counts 4 [*3]and 5 (Penal Law § 220.16 [1]), possessed "one-half ounce or more" of the drug under count 7 (Penal Law § 220.16 [12]), or possessed "one-eighth ounce or more" under count 8 (Penal Law § 220.09 [1]). Although a contrary verdict as to these four counts would not have been unreasonable given the failure to obtain evidence of a chemical analysis of these two pieces of evidence, contrary to defendant's contentions, the failure to conduct a lab test does not automatically result in a reversal of the charges when conducting a weight of the evidence review. As this Court has recognized in People v Van Hoesen (12 AD3d 5 [3d Dept 2004], lv denied 4 NY3d 804 [2005]), the Court of Appeals did not hold in People v Swamp that a formal laboratory test was required to prove guilt beyond a reasonable doubt — only that a defendant may not be found guilty beyond a reasonable doubt based " 'solely' " on the result of a field test (People v Van Hoesen, 12 AD3d at 9 n 2; quoting People v Swamp, 84 NY2d at 733; see Matter of Angel A., 92 NY2d 430, 435 [1998]).
Here, we have more than just a positive field test — which was performed by an experienced detective, and where his testimony regarding the field test and his subsequent weighing of each drug was uncontroverted at trial (see Matter of Angel A., 92 NY2d at 435). For instance, each baggie was found in the same closet as the lab-confirmed substances — one of them even in the same black pouch — and "the jury could reasonably infer from the positive results of those tests that the remaining [packages], which were recovered . . . at the same time, also contained a controlled substance since the untested" substances were in the same style of packing and the contents appear to be similar in nature (People v Gillyard, 70 AD3d 854, 855 [2d Dept 2010], lv denied 14 NY3d 840 [2010]). The other baggie was packaged into a knotted wrap and was found in a silver lock box on the same bedroom closet shelf as the tested drugs, and contained the razor blades, scales and box of sandwich baggies, therefore permitting the jury to infer defendant's intent to sell it from the quantity seized, wrapping materials and the large sum of cash that was found on his person (see People v Smith, 201 AD3d 1126, 1130 [3d Dept 2022], lv denied 38 NY3d 1035 [2022]; see also People v Oates, 222 AD3d 1271, 1273 [3d Dept 2023]). Further testimony confirmed the appearance and form of the substances to be powdered cocaine and crack cocaine, not just from multiple law enforcement officers and two drug task force detectives who had experience handling each narcotic, but also of the girlfriend. Indeed, based on her familiarity and knowledge of drugs, she confirmed that the substances in the untested knotted wraps were powdered cocaine and crack cocaine that defendant would sell to customers (see People v Christopher, 161 AD2d 896, 897-898 [3d Dept 1990], lv denied 76 NY2d 786 [1990]; see generally People v Cruz, 298 AD2d 905, 905 [4th Dept 2002], lv denied 99 [*4]NY2d 557 [2002]). The girlfriend further testified as to the process of preparing the drugs for sale, specifically that she observed defendant on prior occasions take out the substances, weigh them and then package them in a knotted wrap for sale to customers as crack cocaine or powdered cocaine — and she would sometimes complete the sales for him (see People v Fulton, 28 AD3d 1180, 1181 [4th Dept 2006], lv denied 7 NY3d 756 [2006]). She also translated multiple text messages from defendant's phone, confirming certain communications were referring to the sale of the same drugs that were recovered in the search. Critically, at no point during the trial did defendant challenge that the substances were not controlled substances. Accordingly, when viewing this evidence in a neutral light, we cannot say that the verdict with respect to the challenged convictions under counts 4, 5, 7 and 8 were against the weight of the evidence (see People v Smith, 201 AD3d at 1130-1131; People v Gillyard, 70 AD3d at 855; People v McGriff, 201 AD2d 672, 673 [2d Dept 1994], lv denied 83 NY2d 913 [1994]; People v Christopher, 161 AD2d at 897-898; see also People v Imes, 226 AD3d 1080, 1082 [3d Dept 2024], lv denied 41 NY3d 1019 [2024]).
To this further point, defendant contends that he received ineffective assistance of counsel because his attorney failed to, among other things, challenge the lack of a lab test for the two baggies of substances that were not lab tested and failed to preserve other key issues at trial. We disagree. "A claim of ineffective assistance of counsel must be supported with proof that the attorney failed to provide meaningful representation and that there were no strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Njoku, 218 AD3d 1047, 1051 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 1093 [2024]). The record before us reveals a very capable performance by trial counsel, who presented a cogent theory at trial that the girlfriend had been the one who orchestrated the drug sales unbeknownst to defendant and that the People overstated the amount of time he spent at the residence and was around the drugs, but that, following their arrests, the girlfriend and her mother ultimately turned on defendant in order to get her a lesser sentence. In doing so, defense counsel appropriately highlighted that the investigators were entirely unaware of defendant until after the execution of the search warrant — of which, such warrant had only mentioned the girlfriend — and that defendant was in the process of purchasing the house from the girlfriend's mother before the incident. Trial counsel's strategy also was aimed at raising reasonable doubt on defendant's motivation and ability to commit the crimes, presenting evidence that defendant had no incentive to sell drugs because he had multiple successful jobs and a large monetary settlement from a lawsuit, and that he was not originally [*5]from the area and had few local ties — unlike the girlfriend (see People v Truitt, 213 AD3d 1145, 1151 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]). Although defendant criticizes trial counsel for not focusing his strategy on the lack of a chemical analysis on two pieces of evidence, as discussed above, this argument lacks merit given the overwhelming evidence at trial and other lab-tested drugs and drug paraphernalia found alongside the nonconfirmed substances (see People v Meadows, 183 AD3d 1016, 1023 [3d Dept 2020], lv denied 35 NY3d 1047 [2020]), and, therefore, is "merely reflective of defendant's disagreement as to trial counsel's strategies and tactics weighed with the benefit of hindsight" (People v Wilkins, 216 AD3d 1359, 1365 [3d Dept 2023] [internal quotation marks, brackets and citation omitted], lv denied 40 NY3d 1000 [2023]). When considering the evidence, law and circumstances of this case, we cannot say that defendant was deprived of meaningful representation (see People v Calafell, 211 AD3d 1114, 1120 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Machia, 206 AD3d 1272, 1277-1278 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]; see also People v Burton, 215 AD3d 1054, 1063 [3d Dept 2023], lv denied 40 NY3d 927 [2023]).
Defendant's remaining contentions do not warrant prolonged discussion. Defendant's challenge to the indictment as duplicitous and multiplicitous is unpreserved (see People v Agan, 207 AD3d 861, 862 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]; People v Shabazz, 177 AD3d 1170, 1172-1173 [3d Dept 2019]), and nevertheless without merit (see People v Lee, 225 AD3d 1001, 1001 [3d Dept 2024]; People v LaPierre, 189 AD3d 1813, 1817 [3d Dept 2020], lv denied 36 NY3d 1098 [2021]). Defendant's contention that a key witness refused to testify because she had been intimidated by the prosecutor is unsupported in the record before us, as "not every contact between a government agent and a potential defense witness constitutes a substantial interference with the choice to testify" (People v Perkins, 203 AD3d 1337, 1340 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1035 [2022]). Lastly, as there is no record of jury selection for our review, defendant's contentions relating to a specific juror are better developed via a CPL article 440 motion (see People v Davis, 200 AD3d 1200, 1207 [3d Dept 2021]). Defendant's remaining contentions have been examined and found to be lacking in merit or rendered academic.
Aarons, J.P., Reynolds Fitzgerald, McShan and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: At the close of the People's proof and again at the close of defendant's proof, County Court reserved defendant's right to make the necessary motions. However, the record before us fails to demonstrate whether defendant ultimately made such application.
Footnote 2: This testing related to only counts 1, 2, 3 and 6. The forensic scientist testified that the crime lab policy was to only test evidence relating to the highest counts, and she therefore did not test the remaining two pieces of evidence relevant to counts 4, 5, 7 and 8.