People v Dorvil (2025 NY Slip Op 00246)

People v Dorvil

2025 NY Slip Op 00246

Decided on January 16, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 16, 2025

110748 CR-23-2260
[*1]The People of the State of New York, Respondent,
v
Niam Dorvil, Appellant.

Calendar Date:November 19, 2024

Before:Aarons, J.P., Reynolds Fitzgerald, Ceresia, McShan and Mackey, JJ.

Paul J. Connolly, Delmar, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

McShan, J.
Appeals (1) from a judgment of the Supreme Court (Kathleen B. Hogan, J.), rendered August 2, 2018 in Schenectady County, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the second degree (two counts) and reckless endangerment in the first degree, and (2) by permission, from an order of the County Court of Schenectady County (Michael W. Smrtic, J.), entered October 30, 2023, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
In connection with a July 2017 fatal shooting outside the El Dorado, a bar located on Crane Street in the City of Schenectady, defendant was charged by indictment with two counts of criminal possession of a weapon in the second degree and reckless endangerment in the first degree. Defendant was subsequently charged by indictment with murder in the second degree, which alleged that he had acted with a depraved indifference to human life.[FN1]
 Following a jury trial, defendant was found guilty as charged and was later sentenced, as a second felony offender, to a prison term of 25 years to life for the murder conviction; a prison term of 10 years, to be followed by five years of postrelease supervision, for each of the two criminal possession of a weapon convictions; and a prison term of 3½ to 7 years for the reckless endangerment conviction. The latter three convictions were directed to run concurrently to each other, but consecutive to the sentence on the murder conviction — resulting in an aggregate prison term of 35 years to life. Defendant subsequently moved to vacate the judgment of conviction pursuant to CPL 440.10, arguing that he was denied the effective assistance of counsel, and County Court (Smrtic, J.) denied the motion without a hearing. Defendant appeals from the judgment of conviction and, by permission, from the denial of his CPL article 440 motion.
Defendant first argues that the murder and reckless endangerment convictions are not supported by legally sufficient evidence and that the verdict as to those convictions is against the weight of the evidence. Specifically, defendant contends that the People failed to prove beyond a reasonable doubt that the projectile that struck the victim and caused his death came from defendant. Further, defendant argues that the People failed to establish that his actions evidenced a depraved indifference mental state, as they did not rise to the requisite level of recklessness needed to support the conviction. As relevant here, "[a] person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person" (Penal Law § 120.25). Additionally, "[a] person is guilty of murder in the second degree when[,] . . . [u]nder circumstances evincing a depraved indifference to human life, he [or she] recklessly [*2]engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). In the context of both charges, a person acts with the requisite recklessness when "he or she [is] 'aware of and consciously disregard[s] a substantial and unjustifiable' " grave risk of death to another person and "that the disregard of this risk 'constitute[s] a gross deviation from the standard of conduct that a reasonable person would have observed in the situation' " (People v Durham, 146 AD3d 1070, 1074 [3d Dept 2017] [brackets omitted], lv denied 29 NY3d 997 [2017], quoting Penal Law § 15.05 [3]). In that vein, "depraved indifference is best understood as an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (People v Suarez, 6 NY3d 202, 214 [2005]; see People v Feingold, 7 NY3d 288, 296 [2006]). "Due to the wanton nature of this mens rea, depraved indifference murder properly applies only to a small, and finite, category of cases where the conduct is at least as morally reprehensible as intentional murder" (People v Williams, 206 AD3d 1282, 1284 [3d Dept 2022] [internal quotation marks and citations omitted]).
The trial evidence reveals that, on the night in question, an altercation involving several people broke out in front of the El Dorado. The altercation was eventually interrupted when an individual discharged his .45 caliber gun into the sky, striking a streetlight directly overhead. Various cameras, including cameras from local businesses as well as cameras owned by the City, captured several individuals briefly dispersing before eventually returning to congregate in front of the El Dorado. Meanwhile, camera footage depicts defendant exiting a vehicle on Crane Street at an intersection roughly northwest of the El Dorado. A witness testified that defendant had been shouting from the vehicle and approached her on the sidewalk, appearing "intoxicated." According to the witness, defendant's "whole demeanor was off," and she suspected that he had a firearm on him based upon the way he was holding his pants. The witness then continued to walk while defendant began interacting with other individuals in front of another establishment on Crane Street just north of 4th Avenue. Several minutes later, defendant appears on video footage walking on Crane Street in the direction of the El Dorado. The video footage captures defendant suddenly firing several rounds toward the crowd that had gathered in front of the El Dorado. Corroborating that footage, various witnesses testified that they observed defendant firing in the direction of the El Dorado at a crowd of approximately 30 to 35 people.
Immediately as defendant began to fire his weapon, video footage captures the victim, who had been approaching defendant's position from the direction of the El Dorado, turn away from defendant, [*3]exposing the right side of his body to defendant's direction. The victim then flinches and grabs his left side, before running in the opposite direction as defendant toward and past the El Dorado. Video footage and witness testimony establish that the victim eventually collapsed in front of a nearby establishment. The People presented the testimony of a forensic pathologist, who testified that the fatal projectile entered the victim through his right chest and traveled nearly level through his body toward his left side, perforating his heart and eventually lodging in the muscle tissue in his left chest. The pathologist also testified that the projectile was severely deformed and consisted of the lead core of a projectile with no corresponding copper jacket. Consistent with that testimony, a forensic scientist within the firearms unit of the State Police testified that the projectile that struck the victim was a lead core and, due to the lack of any rifling characteristics, she concluded that it had passed through the barrel of a firearm with a copper jacket. The forensic scientist also testified to her conclusion that the seven cartridge casings from discharged 9 millimeter projectiles that were recovered in the area where defendant was depicted as firing came from the same firearm. Further, the evidence established that a copper jacket from a 9 millimeter projectile that was missing its lead core was recovered next to the establishment adjacent to where the victim was struck and, according to the forensic scientist, was fired from the same firearm as several other projectiles that were recovered in the area just beyond the El Dorado and opposite the direction from which defendant was firing.
According to the testimony of another witness, after the victim had passed by the El Dorado, two individuals began returning fire at defendant from two separate locations on Crane Street.[FN2]
The forensic scientist concluded that there were two different caliber projectiles that were fired from that direction toward defendant. The first was a .25 caliber projectile, which differed from the size of the projectile that ultimately struck the victim. The other spent casings recovered from the area of the second shooter were also from a 9 millimeter projectile. However, a witness testified that the victim was already behind those individuals when they began firing toward defendant. The video footage corroborates that testimony, as it depicts the victim running past the El Dorado prior to collapsing on the sidewalk. According to several witnesses, defendant attempted to flee after he had discharged all of the projectiles in his magazine. The video footage and witness testimony establish that, while heading northwest on Crane Street, defendant was struck with a projectile, went down to the ground, got back up and went down again, before eventually climbing into the same vehicle that he had arrived in earlier.[FN3]
Law enforcement officers who responded to the scene received [*4]indications from the crowd that the shooter had also been shot and had fled the scene in a vehicle. Video footage tracked the vehicle to Ellis Hospital in the City of Schenectady and depicted defendant being removed from the vehicle and brought inside by hospital personnel, where he was initially treated for several gunshot wounds before later being moved to Albany Medical Center. Forensic testing of bloodstains in the area where the video footage depicted defendant being shot confirmed a DNA match with defendant. Further, the forensic scientist determined that the projectile that struck defendant was not fired from the same firearm as the aforementioned copper jacketing that was recovered without its lead core. The forensic scientist also concluded that the casings that were recovered in front of the El Dorado in the area where an individual was firing his gun toward defendant were from a 9 millimeter projectile and, according to the forensic scientist, were consistent with the projectiles that struck defendant but inconsistent with copper jacketing near where the victim was struck.
Viewing the foregoing evidence in the light most favorable to the People, we find that the evidence is legally sufficient to sustain defendant's convictions for murder and reckless endangerment. Turning first to his contention that the People failed to establish that it was his weapon that fired the fatal projectile, defendant focuses on video footage that depicts puffs of smoke on the wall adjacent to the direction from which defendant was discharging his weapon, which suggest that he was aiming his weapon up and down. According to defendant, this is significant when considered alongside the testimony of the forensic pathologist that the projectile that struck the victim entered on a path that was parallel across his chest, as opposed to an upward or downward trajectory consistent with a ricochet from a higher or lower angle. Defendant also argues that the People failed to produce any expert testimony concerning the People's theory that the fatal projectile had ricocheted prior to striking the victim. However, these contentions discount the other proof consisting of the number of projectiles discharged, the timing of the discharge from defendant's weapon relative to the moment that the victim was struck and the characteristics of the fatal projectile that struck the victim — specifically, the lead core of an unjacketed projectile and the recovery of an appropriately sized copper jacket in between where defendant was firing his weapon and where the victim was struck — as established by the forensic testimony. Further, the foregoing proof, considered alongside the footage depicting defendant being struck with a projectile while fleeing, the location of the two other individuals firing at that time and the forensic evidence of the various types of shell casings recovered on scene, provided facts from which a rational person could reasonably conclude that the projectile [*5]that struck the victim came from defendant's firearm and not the other individuals who began firing at defendant shortly thereafter (see People v Timmons, 78 AD3d 1241, 1243-1244 [3d Dept 2010], lv denied 16 NY3d 837 [2011]; see also People v Mitchell, 132 AD3d 1413, 1416 [4th Dept 2015], lv denied 27 NY3d 1072 [2016]; People v Thomas, 272 AD2d 892, 893 [4th Dept 2000], lv denied 95 NY2d 858 [2000]).
As to defendant's arguments that the People did not establish that he acted with the requisite depravity or engaged in reckless conduct, we note that the video footage clearly depicts defendant firing multiple projectiles into a crowd of people. While defendant suggests that the crowd was insufficiently dense, as evidenced by the fact that only one individual was struck, or that the trajectory of the projectiles fired reveals his lack of intent to strike anyone, those contentions do not negate the reasonable conclusion that his conduct evidenced a depraved indifference to human life (see People v Potomont, 225 AD3d 789, 790 [2d Dept 2024], lv denied 42 NY3d 929 [2024]; People v Maeweather, 172 AD3d 1646, 1648-1649 [3d Dept 2019], lv denied 34 NY3d 1017 [2019]; People v Timmons, 78 AD3d at 1244; People v Payne, 71 AD3d 1289, 1291 [3d Dept 2010], lv denied 15 NY3d 777 [2010]). We also find that the verdicts are not contrary to the weight of the evidence. Although a jury could reasonably have returned a different verdict as to the proof relative to defendant's mens rea, including the conclusion that defendant was intoxicated at the time of the shooting, or rejected the People's theory that the fatal projectile was fired from defendant's weapon, we are satisfied that the jury's resolution of the allowable inferences from the facts presented was appropriate (see People v Serrano, 173 AD3d 1484, 1486 [3d Dept 2019], lv denied 34 NY3d 937 [2019]; People v Durham, 146 AD3d 1070, 1074 [3d Dept 2017], lv denied 29 NY3d 997 [2017]).
Defendant further argues that Supreme Court erred in denying his motion to suppress his statements to police officers during an interview that occurred in the hospital, asserting two separate bases for suppression. Turning first to his assertion that his statements were involuntary, we find that contention without merit. Although defendant had been treated in the hospital for his wounds and undergone several surgeries prior to the interview, one of the interviewing investigators testified that defendant, who had been read and acknowledged his Miranda rights prior to questioning, was coherent, able to converse and understood the questions posed to him. Further confirming the investigator's account is the recording of defendant's interview, which reveals that defendant responded appropriately to the investigators' inquiries and, at one point, questioned the motives of the investigators and told them to leave. Accordingly, giving the appropriate weight to Supreme Court's factual findings, "we conclude, in viewing the totality of the circumstances[*6], that there is sufficient evidence to support the determination" that defendant voluntarily provided his statements to investigators (People v May, 263 AD2d 215, 219 [3d Dept 2000], lv denied 94 NY2d 950 [2000]; see People v Leppanen, 218 AD3d 995, 1002 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]; People v Maynard, 143 AD3d 1249, 1249-1250 [4th Dept 2016], lv denied 28 NY3d 1148 [2017]; People v Parson, 209 AD2d 882, 883 [3d Dept 1994], lv denied 84 NY2d 1014 [1994]).
However, we agree with defendant's contention that he unambiguously invoked his right to remain silent during the interview. "A defendant's invocation of the right to remain silent must be scrupulously honored once the right is asserted in an unequivocal and unqualified fashion[, and] [w]hether that request was unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request, including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (People v Slivienski, 204 AD3d 1228, 1235 [3d Dept 2022], lv denied 38 NY3d 1136 [2022] [internal quotation marks, brackets and citations omitted]; see People v Henry, 133 AD3d 1085, 1086 [3d Dept 2015]). Approximately 45 minutes into the interview, after defendant had been provided his Miranda rights and answered numerous inquiries, defendant told the investigators that just prior to the shooting he observed a fight between a man and a woman on Crane Street. Defendant then provided no audible responses to investigators' questions for several minutes. One of the investigators repeated the inquiry as to the next thing defendant remembered, and, after about eight seconds of silence, defendant said "get the f**k out of here b***h, you trying to play me." The investigator then asked defendant what he said and defendant repeated his statement. This prompted the investigator to respond that he would leave if defendant wanted him to. However, the investigator then attempted to persuade defendant to continue the interview, stressing that the investigators needed defendant's side of the story in light of the damaging evidence against him. It is evident from this interaction that the investigators understood defendant's statement as an unequivocal request for them to leave the room and for the interview to end (see People v Williams, 184 AD3d 1010, 1013 [3d Dept 2020], lv denied 35 NY3d 1097 [2020]; People v Harris, 177 AD3d 1199, 1203-1204 [3d Dept 2019], lv denied 35 NY3d 970 [2020]; see also People v Colon, 185 AD3d 1510, 1512 [4th Dept 2020], lv denied 35 NY3d 1093 [2020]). By continuing the interview without providing further warnings, defendant's right to remain silent was violated and the remainder of the recorded interview should have been suppressed (see People v Marrero, 199 AD3d 1471, 1473-1474 [4th Dept 2021], lv denied 38 NY3d 929 [2022]; People v Leflore, 154 AD3d 1164, 1167 [3d Dept 2017]; People v Henry, 133 AD3d at [*7]1087; compare People v Williams, 184 AD3d at 1013).
Nevertheless, our inquiry is not complete, as we must assess whether that error was harmless. "Where, as here, the asserted error is of a constitutional dimension, the error may be deemed harmless only if there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt" (People v Johnson, 106 AD3d 1272, 1277 [3d Dept 2013] [internal quotation marks and citations omitted], lv denied 21 NY3d 1043 [2013]; see People v Best, 19 NY3d 739, 744 [2012]). In our view, the aforementioned evidence of defendant's guilt, which included multiple angles of video footage that depicted defendant on scene and discharging several projectiles from his firearm at a crowd, together with witness testimony that corroborated the footage, was overwhelming. To that end, the inculpatory statements provided after defendant's invocation, which largely consisted of defendant responding in the affirmative to prompts by investigators that he was "mad at the world," offered little to the ultimate conclusion by the jury that he was acting with depraved indifference. Moreover, it is notable that defense counsel utilized various exculpatory statements made by defendant throughout the interview, such as his lack of intent to harm anyone, to stress the defense that defendant did not act with the requisite mens rea to support the charges requiring a showing of depraved indifference — an argument that defendant again relies upon in this appeal. For these reasons, we conclude that the error was harmless under the constitutional standard and that reversal is not required (see People v Slivienski, 204 AD3d at 1236; see People v Hadfield, 119 AD3d 1224, 1228 [3d Dept 2014], lv denied 24 NY3d 1002 [2014]; People v Whitehead, 119 AD3d 1080, 1082 [3d Dept 2014], lv denied 24 NY3d 1048 [2014]; People v Johnson, 106 AD3d at 1277-1278; see also People v Kabia, 197 AD3d 788, 791 [3d Dept 2021], lv denied 37 NY3d 1162 [2022]).
As to defendant's contention that Supreme Court committed reversible error by closing the courtroom for the testimony of a witness, we disagree. "A defendant's right to a public trial, although fundamental, is not absolute; a trial court may exercise its discretion to close a courtroom, but must do so sparingly and then, only when unusual circumstances necessitate it" (People v McGough, 122 AD3d 1164, 1168 [3d Dept 2014] [internal quotation marks, ellipsis and citations omitted], lv denied 24 NY3d 1220 [2015]). In order to satisfy Sixth Amendment scrutiny of "whether the right to an open trial will give way to other rights or interests," the proponent for closure "must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure[*8]" (People v Jones, 96 NY2d 213, 217 [2001] [internal quotation marks and citation omitted]).
Defendant's contentions are primarily directed to the lack of interest likely to be prejudiced and Supreme Court's failure to place its consideration of any reasonable alternatives on the record. Beginning with the overriding interest at stake, we find that the People properly established that the safety of the confidential witness would be jeopardized if the courtroom was open to the public during his testimony, based upon information relayed to law enforcement on the morning of his scheduled testimony reflecting that certain individuals were in the area searching for him at that time (see People v Carson, 292 AD2d 461, 462 [2d Dept 2002], lv denied 98 NY2d 673 [2002]).[FN4] Notably, the cooperating witness had already been relocated from the City of Schenectady for his protection. As to Supreme Court's consideration of reasonable alternatives to closure, although defendant accurately posits that he did not bear any burden to suggest such alternatives (see Presley v Georgia, 558 US 209, 214 [2010]), the court's failure to expressly state those considerations on the record does not necessitate reversal in this case (see People v Ramos, 90 NY2d 490, 504-505 [1997], cert denied 522 US 1002 [1997]). To that point, we find that the record bears out that Supreme Court's decision implicitly considered such alternatives, but ultimately decided against them in favor of permitting defendant to engage in a more expansive cross-examination as to the credibility of the witness, including probing the extent and nature of the witness' cooperation agreement (see People v Garay, 25 NY3d 62, 70 [2015], cert denied 577 US 985 [2015]; People v Echevarria, 21 NY3d 1, 17 [2013], cert denied 571 US 1111 [2013]; People v Cerroni, 225 AD3d 1117, 1119 [4th Dept 2024], lv denied 41 NY3d 1017 [2024]). The trial record also reflects that Supreme Court was made aware of the makeup of attendees at trial and that it considered that fact in ordering a limited closure for a single witness (see People v Ruffin, 178 AD3d 455, 456 [1st Dept 2019]; People v Manning, 78 AD3d 585, 586 [1st Dept 2010], lv denied 16 NY3d 861 [2011], cert denied 565 US 889 [2011]; see also People v Carson, 292 AD2d at 462). Accordingly, we find that the constitutional requirements for the limited closure were satisfied.
Defendant next raises two arguments directed at his sentence. Defendant first contends that the sentence is illegal inasmuch as the prison terms for the possessory crimes should not have been imposed consecutive to the murder and reckless endangerment convictions. We agree. "Where a defendant is charged with criminal possession of a weapon pursuant to Penal Law § 265.03 (3), as well as a crime involving use of that weapon[,] consecutive sentencing is allowed so long as the defendant knowingly unlawfully possesses a loaded firearm before forming the intent to cause a crime with that weapon" (People v Graham[*9], 215 AD3d 998, 1010 [3d Dept 2023], lv denied 40 NY3d 928 [2023] [internal quotation marks, brackets, ellipsis and citations omitted]). "Consecutive sentences imposed based upon separate and distinct acts must be supported by identifiable facts, and the burden of establishing such acts rests upon the People" (People v De Maio, 304 AD2d 988, 988-989 [3d Dept 2003] [internal quotation marks and citations omitted]; see People v Parks, 180 AD3d 1109, 1110 [3d Dept 2020]).
Contrary to the People's position on appeal, as well as their representations at sentencing, the testimony of the witness who encountered defendant several minutes prior to the shooting did not clearly establish that defendant possessed the weapon at a time sufficiently distinct from the subsequent discharge of that weapon.[FN5] Supreme Court appears to have accepted this erroneous assertion during sentencing. In support of their contention, the People rely on the testimony of that witness, whose initial encounter with defendant is captured in the video footage. The witness testified that defendant exited a vehicle and approached her, making flirtatious comments. According to the witness, because she was not from the area and was wearing jewelry at the time, she felt threatened by the way defendant had approached her. Further observing defendant's demeanor alongside the fact that he was grabbing his pants as they were falling down, the witness asked him directly if he had a gun and was going to shoot her, and he responded "Nah. You scared?" The witness expressly stated, however, that she did not see a gun during the encounter; rather, the witness surmised from the way defendant was holding his pants that he was in possession of one. The witness testified that, after their interaction ended, defendant began conversing with individuals in front of another establishment and she did not observe him again until she later saw him discharging his weapon at the crowd.
At most, the witness' testimony considered by itself established that defendant was conducting himself as if he was in possession of a firearm — based upon her prior experience observing individuals who were in possession of a firearm — which is attenuated from the conclusion that defendant had a loaded firearm at that moment (compare People v Walton, 168 AD3d 1103, 1107 [2d Dept 2019], lv denied 33 NY3d 1036 [2019]; People v Ventura, 167 AD3d 401, 402 [1st Dept 2018], lv denied 32 NY3d 1210 [2019]). Furthermore, the video footage does not establish defendant's possession of a loaded firearm at that time, nor does it maintain a continuous view of defendant during the interval between his encounter with the witness and the time when he approached the El Dorado and proceeded to fire a weapon (compare People v Malloy, 33 NY3d 1078, 1080 [2019]; People v Harris, 195 AD3d 1535, 1537 [4th Dept 2021], lv denied 37 NY3d 1027 [2021]). Although it is certainly possible that defendant possessed a loaded firearm during his encounter with the [*10]witness, the quantum of proof falls far short of establishing such possession, separate and distinct from the moments prior to the shooting (compare People v Brown, 21 NY3d 739, 751 [2013]; People v Belton, 199 AD3d 1373, 1375 [4th Dept 2021], lv denied 37 NY3d 1159 [2022]; People v Davis, 184 AD3d 525, 526-527 [1st Dept 2020], lv denied 35 NY3d 1112 [2020]; People v Crum, 184 AD3d 454, 456-457 [1st Dept 2020], lv denied 35 NY3d 1065 [2020]; People v Brown, 155 AD3d 509, 510 [1st Dept 2017], mod 33 NY3d 983 [2019]). To the extent that the People suggest that the jury clearly found that defendant possessed a loaded firearm during his encounter with the witness, neither the indictment nor the jury charge reflect that the jury was specifically asked to determine whether possession pursuant to Penal Law § 265.03 occurred prior to and distinct from the subsequent shooting (see People v Boyd, 192 AD3d 1659, 1661 [4th Dept 2021]; see generally People v Parks, 95 NY2d 811, 815 [2000]; People v Murray, 37 AD3d 247 [1st Dept 2007], lv denied 9 NY3d 848 [2007]; People v Washington, 9 AD3d 499, 503 [3d Dept 2004], lv denied 3 NY3d 682 [2004]). Accordingly, we find that the People failed to meet their burden and that the sentence for the conviction on count 2 must run concurrent to the remaining convictions (see People v Tripp, 177 AD3d 1409, 1410-1411 [4th Dept 2019], lv denied 34 NY3d 1133 [2020]; People v Harris, 115 AD3d 761, 762-763 [2d Dept 2014], lv denied 23 NY3d 1062 [2014]; compare People v Durham, 146 AD3d at 1075).[FN6]
Noting the modification to defendant's sentence, and considering his "extensive criminal history, the brutal and senseless nature of his acts and his failure to accept responsibility for them," we reject defendant's remaining argument that his sentence is unduly harsh and excessive and decline his invitation to reduce it in the interest of justice (People v Malloy, 166 AD3d 1302, 1311 [3d Dept 2018], affd 33 NY3d 1078 [2019]; see People v Pica-Torres, 230 AD3d 855, 863 [3d Dept 2024]).
Finally, turning to defendant's claims of ineffective assistance of counsel, his mixed claims "are grounded upon matters appearing both on the record and outside the record and, therefore, they are assessed together, in totality, to determine whether he was deprived of meaningful representation" (People v Kendricks, 226 AD3d 1150, 1157 [3d Dept 2024], lv denied 41 NY3d 1003 [2024] [internal quotation marks and citations omitted]). Turning first to the denial of his CPL 440.10 motion without a hearing, "a hearing is only required if the submissions show that the nonrecord facts sought to be established are material and would entitle the defendant to relief. Furthermore, a court may deny a vacatur motion without a hearing if it is based on the defendant's self-serving claims that are contradicted by the record or unsupported by any other evidence" (People v Johnson, 221 AD3d 1172, 1175-1176 [3d Dept 2023], lv denied 41 NY3d 965 [2024] [internal quotation marks [*11]and citations omitted]). Defendant's affidavit largely focuses on purported conversations between him and his counsel; however, the assertions that his requests were ignored or that his trial counsel departed from decisions on strategy are supported entirely by defendant's own self-serving affidavit, and the absence of an affidavit from his counsel is entirely unexplained (see People v Hooker, 230 AD3d 1465, 1468 [3d Dept 2024]; People v Podeswa, 205 AD3d 1139, 1140-1141 [3d Dept 2022], lv denied 38 NY3d 1135 [2022]). Accordingly, to the extent that defendant relies upon those conversations to substantiate his claims of ineffective assistance of counsel, we find no abuse of discretion in County Court resolving those contentions without a hearing (see People v Clark, 231 AD3d 1291, 1293 [3d Dept 2024]; People v Johnson, 221 AD3d at 1176; People v Burton, 215 AD3d 1054, 1063-1064 [3d Dept 2023], lv denied 40 NY3d 927 [2023]; see also CPL 440.30 [4] [d]).
As to the merits of his record-based contentions, we find that defendant fails to establish that his counsel's conduct was devoid of any strategic reasoning. Turning first to defendant's assertion that counsel should have sought to remove a particular juror based upon her apparent bias, we find that argument entirely unavailing. "[J]ury selection involves a quintessentially tactical decision, and defendant failed to show the absence of a strategic reason to allow the juror to remain on the panel, especially where the juror affirmed her ability to be impartial" (People v Drumgold, 206 AD3d 1044, 1048-1049 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1150 [2022]). Specifically, the juror was unequivocal in stating that she would be able to be impartial, and the tenuous acquaintance with another prosecutor in the District Attorney's office who had no involvement in the case at hand does not suggest any bias on her part (see People v Green, 190 AD3d 1094, 1100 [3d Dept 2021], lv denied 36 NY3d 1097 [2021]; see also People v Thompson, 21 NY3d 555, 561 [2013]). As to the failure to retain a ballistics expert, we note that defendant fails to provide any proof in support of his conversation with his counsel and otherwise fails to provide any support for the premise that such an expert would have provided testimony contrary to that of the People's expert (see People v Werkheiser, 208 AD3d 1474, 1478 [3d Dept 2022]; People v Richards, 177 AD3d 1280, 1281 [4th Dept 2019], lv denied 35 NY3d 994 [2020]). In any event, defense counsel engaged in an effective cross-examination of the People's expert focused on the varying amounts of firearms that could have discharged the fatal projectile (see People v Mosley, 155 AD3d 1124, 1129 [3d Dept 2017], lv denied 31 NY3d 985 [2018]). Similarly, defendant did not submit an affidavit explaining that a medical professional would assert that defendant was incapable of giving voluntary statements at the time of his interview and, in any event[*12], we do not discern from the record that counsel's decision to forgo such an expert was clearly devoid of strategy inasmuch as counsel utilized defendant's statements as part of his intoxication defense (see People v Sposito, 37 NY3d 1149, 1151 [2022]; compare People v Oliveras, 90 AD3d 563, 563-564 [1st Dept 2011], affd 21 NY3d 339 [2013]). As to that defense, defendant again offers nothing in support of his motion to establish the degree of his intoxication and, in any event, the potential testimony he references "falls short of establishing that defendant possessed — and counsel ignored — a viable intoxication defense" (People v Guynup, 159 AD3d 1223, 1226 [3d Dept 2018], lv denied 31 NY3d 1082 [2018]; see People v Muller, 57 AD3d 1113, 1114-1115 [3d Dept 2008], lv denied 12 NY3d 761 [2009]; see generally People v Heidgen, 22 NY3d 259, 279 [2013], cert denied 574 US 1063 [2014]). In short, we find no indication that counsel's "general handling of the intoxication aspect of defendant's defense . . . fell below an objective standard of reasonableness" (People v Martin, 207 AD3d 403, 403 [1st Dept 2022], lv denied 38 NY3d 1189 [2022]). Finally, defendant's arguments concerning the failure of counsel to object during the People's summation have been considered and found lacking in merit. Altogether, it is evident that defense counsel was faced with the difficult task of preparing a defense in the face of overwhelming video, eyewitness and forensic evidence that depicted defendant discharging a firearm toward a crowd of people; under these circumstances, we are satisfied that counsel's pretrial motion practice, articulation of a theory intended to cast doubt on the mens rea of the top charges and cogent arguments seeking a lesser prison term reflect that defendant was provided meaningful representation (see People v Kellum, ___ AD3d ___, ___, 2024 NY Slip Op 06629, *5 [3d Dept 2024]; People v Miley, 229 AD3d 969, 974 [3d Dept 2024], lv denied 42 NY3d 971 [2024]; People v White-Span, 182 AD3d 909, 916 [3d Dept 2020], lv denied 35 NY3d 1071 [2020]).
Aarons, J.P., Reynolds Fitzgerald, Ceresia and Mackey, JJ., concur.
ORDERED that the judgment is modified, on the law, by directing that the sentence imposed for count 2 of the indictment shall run concurrently with the remaining sentences; and, as so modified, affirmed.
ORDERED that the order is affirmed.

Footnotes

Footnote 1:The indictments were later consolidated on the People's motion.

Footnote 2:The testimony from other witnesses, as well as the video footage and forensic evidence, established that the individual who initially fired the .45 caliber weapon did not discharge another projectile after initially shooting into the sky.
Footnote 3:The trial evidence established that defendant suffered three separate gunshot wounds while attempting to flee the scene.

Footnote 4:Notably, the cooperating witness had already been relocated from the City of Schenectady for his protection.

Footnote 5:Supreme Court appears to have accepted this erroneous assertion during sentencing.

Footnote 6:The People concede that the possessory crime pursuant to Penal Law § 265.03 (1) (b) stemmed from possession of a firearm at the time of the shooting. Accordingly, to the extent that there remains any confusion stemming from any inconsistency between the sentencing transcript and the uniform sentence and commitment form, our determination should clarify that all of defendant's sentences should run concurrently, resulting in an aggregate prison term of 25 years to life.